William H. BIRD and Shelby H.
Carter, Jr., Plaintiffs,

v.

COMPUTER TECHNOLOGY, INC. and
LTV Aerospace Corporation,
Defendants.

No. 71 Civ. 1414, MIG.

United States District Court,
S. D. New York.

Sept. 18, 1973.

Finley, Kumble, Underberg, Persky & Roth, New York City, for plaintiffs by Donald S. Snider, New York City, of counsel.

Williamson & Schoeman, New York City, for defendant Computer Technology, Inc. by Michael E. Schoeman, New York City, of counsel.

Dannenberg, Hazen & Lake, New York City, for defendant LTV Aerospace Corp. by Arthur W. Baily, New York City, of counsel.

GURFEIN, District Judge.

This is a diversity action in which the plaintiffs, former employees of Computer Technology, Inc. ("CT"), a Delaware corporation with its principal place of business in Texas, seek damages in lieu of retirement benefits from their former employer and from its parent, LTV Aerospace Corp. ("LTVA"), a Delaware corporation with its principal place of business in Texas, which allegedly guaranteed performance. CT/East, to be mentioned later, is a Delaware corporation not named as a defendant. The jurisdictional amount is properly alleged. A trial was had to the Court on May 1 and 2, 1973. The facts as stipulated and as adduced are as follows:

In 1969 the plaintiffs William H. Bird ("Bird"), a Connecticut citizen and Shelby H. Carter, Jr. ("Carter"), a New York citizen, were employed by International Business Machines Corp. ("IBM"). They both were then 38 years old. Bird had been employed by IBM for 11½ years and Carter for 13¼ years.

Bird was first approached in January 1969 by William Woerner, President of CT, who told him that James Ling of LTVA had been talking to him about forming a subsidiary company of CT for computer servicing in New York. Woerner solicited Bird to become President of the New York subsidiary and, later, Carter to be an executive. Among other matters discussed was the point that the directors of IBM had voted in January 1969 for a new policy of retirement benefits. Under the new IBM plan, em-

ployees who had been employed ten years instead of the then required fifteen years, would be eligible for IBM retirement benefits. It was anticipated that the new policy of IBM would be submitted shortly to a shareholders meeting of IBM in April and ratified. The proxy statement was prepared in February. Both Bird and Carter were not then eligible for retirement benefits under the existing IBM plan, but would be shortly when the new plan was ratified.

In the course of the discussions, Bird and Carter were told that certain customer prospects of CT could not wait and that the plaintiffs had to come aboard promptly. Bird and Carter asked for and were given assurances by Woerner that they would have the same retirement benefits if they joined CT as they would have if they stayed with IBM.

Bird and Carter became employees of CT, leaving IBM before the shareholders meeting of IBM on April 28, 1969 that would have assured their retirement benefits after only ten years of service, but which had no retroactive effect. By leaving, Bird and Carter lost these rights.

They were given a standard form of employment contract by CT which did not specify retirement benefits. This was superseded by employment contracts effective as of March 31, 1969, which contained paragraph 5 reading as follows:

"5. Bird [Carter] as an employee of CT, shall be entitled to receive employee benefits at least equal to those provided under the various plans (other than any stock purchase or option plans) presently provided by LTV Aerospace Corporation, a Delaware corporation and the parent of CT, to its own employees. In respect to retirement, both Bird's [Carter's] *eligibility* for retirement benefits *and the amount* of his retirement benefit shall be determined first using his actual employment date of March 31, 1969 and then using an assumed employment date of October 13, 1957 [December 12, 1955]. Should the use of this assumed employment date produce a retirement benefit of larger amount and/or longer duration than his actual employment date, then Bird [Carter] will be entitled to receive supplemental payments directly from CT equal to the difference in duration and/or amount. These supplemental payments will be made at such times and in such manner as are provided for the payment of retirement benefits under the then existing retirement plan." (Ex. 3; Ex. 18; emphasis supplied).

Subject to later discussion of the admissibility of parol evidence, the evidence indicated the following:

Bird's and Carter's recollection concerning the communications with CT, through its President William Woerner differ somewhat, though not materially. At one point Bird testified that Woerner had actually told him in the course of one of the meetings that he, Bird, would be entitled to the retirement benefits "regardless of how long" Bird remained in the employ of CT (Tr. 172). Bird, however, retrenched a bit later in his testimony stating: "Your Honor, I probably should withdraw the point that I pinned him [Woerner] down as to whether or not I would have this vesting, if I left during the five year period . . . . It was more my understanding what vesting meant" (Tr. 174). In any event Bird was clear, as he had been at his deposition, that Woerner "made a commitment to us that, you will not lose any of your vesting" (Tr. 173).

Carter testified that at his first meeting with CT representatives, he had been reassured by a Robert Kelly as well as Woerner, by their statement to the effect: "You don't have to worry about leaving IBM, your vested rights, your salaries, because you know you get the same contract we all have, a five year contract" (Tr. 87). Carter testified that by the third meeting, he and Bird "were getting a little more interested in the proposition [of joining CT] obvious-

ly or we wouldn't be there and by the third time we talked about the unique position that Bill Bird and I were in in that we had more than ten and less than fifteen years with IBM and the new vesting was going to be passed and they [Woerner] said because of that we [CT] will write you a special contract or special clause, as I said earlier, stating that your date of rank would be in my case December 12, 1955 for retirement and vested rights purposes and I said fine" (Tr. 89; see Tr. 19).

Both Bird and Carter testified that they had advised Woerner of their reluctance at leaving IBM on the eve of the change in the vesting requirements at IBM but that Woerner impressed upon them the urgency of their joining CT at once (Carter Tr. 23, 26; Bird Tr. 117).

At trial Bird recalled Woerner as having said "We need the people. We have some very imminent contracts to be signed and then serviced by people here in New York, and this [vesting problem] will be taken care of, no problem, as though we went to work for CT in 1957" (Tr. 117).

In part because they were impressed with the urgency of their signing immediately and in part because they understood that the ten year vesting requirement of CT would be satisfied by their previous employment with IBM, Bird and Carter say they resigned from IBM prior to the change in the IBM retirement plan and joined CT in the end of March or beginning of April.

CT also arranged for Bird to talk to representatives of Goldman, Sachs & Co., investment bankers, about the viability of the proposed CT subsidiary.

There followed a series of meetings between representatives of CT (Roger Kelley and William Woerner) and LTV (John Dixon, Vice President of LTV) (Tr. 112–13) which were attended by both Bird and Carter and a third IBM employee, Bill Brown.[1] These meetings took place at the Regency Hotel in a suite owned by LTV. It was during these meetings that the conversations concerning vesting and rights to retirement benefits, alluded to above, took place. It was at the last meeting that Woerner impressed upon Bird and Carter the urgency of their joining CT.

Prior to the third meeting, Carter testified that he and Bird flew to Dallas where they met representatives of CT (Tr. 22–23). Bird was less clear, but recalled he may have taken a second trip to Dallas (Tr. 108). Carter also testified that he received a blank standard employment agreement from CT (Tr. 22).

Following the third meeting at the Regency, Bird and Carter each resigned from IBM (Tr. 24, 117). They then flew to Skokie, Illinois, where they signed the initial version of the employment agreement (Exs. 2, 17). That agreement became ineffective upon execution of the employment agreement dated effective March 31, 1969, outlined above (Exs. 3, 18). This new agreement was unconditionally guaranteed by LTVA, which guaranty was accepted by the plaintiffs in lieu of a promised guaranty by LTV, the parent of LTVA (Tr. 144).

On June 30, 1969 an agreement of amendment was signed by both Bird and Carter (Exs. 4, 19). And on June 30, 1969 Bird and Carter each signed agreements assigning their contracts to CT/East (Exs. 5, 20).

It was stipulated prior to trial that LTVA consented to the agreements dated June 30, 1969 which assigned the employment agreements to CT/East (PTO 2(p)(q)). There was no evidence adduced, however, that LTVA actually executed the form of guaranty provided on the assignment (see Exs. 5, 20).

CT/East did not get off the ground. It became known that efforts were being made to sell it and it was later sold. Both plaintiffs became discouraged and

---

1. Brown had already completed fifteen years of service at IBM, and his retirement benefits under the IBM plan had already vested.

left during the first year of their five year contracts.

Bird's salary at IBM at his termination was $62,116.27 (excluding bonuses) as Regional Marketing Director. Carter's salary was $51,400 (excluding bonuses) as District Manager of Manhattan.

Bird claims that the cost of purchasing benefits equal to those to which he is entitled under the CT/LTVA plan is $55,623, and on the same basis, Carter claims $53,392. On a historical basis of earnings the amount would be $35,371 for Bird and $36,364 for Carter.

They alternatively seek an order of specific performance.

In their post-trial papers, the plaintiffs also seek declaratory relief, though no such prayer was included in the complaint.

The plaintiffs, after leaving CT/East, sought acknowledgment of their claimed retirement benefits which was refused. They, therefore, claim an anticipatory breach and an acceleration of the benefits claimed.[2]

The defendants deny liability and contend that acceleration is not permitted, and they contend that, in any event, the commuted present value of the benefits would be no more than $8,784.74, in the case of Bird, and $8,147 in the case of Carter.

**I.** *The Motion to dismiss by LTVA for lack of jurisdiction over the person.*

At the conclusion of the trial, the defendant LTVA, sued as the alleged guarantor of the employment contracts, renewed its motion to dismiss the complaint against it on the ground that the court has no personal jurisdiction over it.

There is no contention that LTVA was doing business in New York "with a fair measure of permanence and continuity" Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917); CPLR § 301, McKinney's Consol.Laws, c. 8. It is contended, however, that there is jurisdiction under the long arm statute, CPLR § 302(a).[3]

■ Long arm jurisdiction cannot be supported either on the theory of physical presence, cf. Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951, 955 (2 Cir. 1967), or of agency, cf. Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 259 N.E.2d 506 (1970). There was no showing of physical presence of LTVA in New York, for although LTVA on occasion used the suite of LTV at the Regency Hotel in New York City, no officer of LTVA negotiated with the plaintiffs in New York. Nor was there a showing of agency. While I find that Woerner told Bird that LTV would guarantee the employment contract, there was no ratification by the Board of LTV that might have confirmed such agency. Instead it

**2.** At the time of trial, Bird had become corporate Vice President of Itel Corporation in charge of its data processing group. Carter had become Vice President for Systems Marketing of Xerox Corporation.

**3.** CPLR § 302(a) reads as follows:

"(a) *Acts which are the basis of jurisdiction.* As to a cause of action arsing from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state."

was the Board of LTVA which approved the guarantee at a meeting in Texas, and there is insufficient evidence that an LTVA officer negotiated the guarantee in New York. Woerner, in his conversations with the plaintiffs, brought the prestige of LTV into focus as the guarantor. LTVA was not mentioned. I find that a "traditional agency relationship" did not exist between LTVA and and Woerner. Marsh v. Kitchen, 480 F. 2d 1270, at 1273 (2 Cir. 1973).

■ The question still arises whether a guarantee by the foreign corporation defendant of an employment contract made and to be performed in New York is the proper basis for personal long arm jurisdiction.

Ferrante Equipment v. Lasker-Goldman, 26 N.Y.2d 280, 309 N.Y.S.2d 913, 258 N.E.2d 202 (1970) held, in the words of the Court of Appeals in Hi Fashion Wigs, Inc. v. Peter Hammond Advertising, Inc., 32 N.Y.2d 583, 587–588, 347 N.Y.S.2d 47, 51, 300 N.E.2d 421, 423 (1973), "that the mere performance of a contract in New York, when it is guaranteed elsewhere and the parties transacted no other business with respect to it in this State, would not, in and of itself, be sufficient to subject either party to the process of our courts." The defendant there was the guarantor, who did no business in New York, though he guaranteed a contract to be performed in New York. I cannot distinguish the Court of Appeals' own gloss on *Ferrante,* supra, from the facts at issue, and am constrained to hold it applicable.

The complaint against LTVA is dismissed.

II. *Liability.* The defendant CT contends that the employment contract is an entire contract and that the obligation of the plaintiffs to work (¶ 2) is indivisible from the obligation of the employer to give retirement benefits (¶ 5). Hence, it is argued, the breach by the plaintiffs of their obligation to work for the stipulated five year term excuses performance by the employer.

■ Normally, an employment contract is so construed. An employee who breaches his employment agreement may not generally claim future benefits that are not payable under the employment agreement until after completion of the term. See Coletti v. Knox Hat Co., Inc., 252 N.Y. 468, 169 N.E. 648 (1930); Alexander v. Equitable Life Assurance Society, 233 N.Y. 300, 135 N.E. 509 (1922); Stevens v. Elizabeth Arden, Inc., 253 App.Div. 358, 2 N.Y.S.2d 187 (1st Dept. 1938); De Long v. Elizabeth Arden, Inc., 16 N.Y.S.2d 837 (Sup.Ct.N.Y.Co.1939).

The plaintiffs contend, however, that this doctrine is not applicable where the contract is divisible or separable rather than entire. If the promises were the subject of separate agreements, continued employment might not be considered to be a condition precedent to payment of retirement benefits. In this case the provisions for employment and the provisions for retirement benefits are in the same agreement. The plaintiffs contend, however, that the two were integrated into a single instrument by CT's lawyers in spite of the intention that the agreements were to be separate.

■ I believe that the plaintiffs are right in this regard. Although retirement benefits were discussed in connection with the prospective employment of the plaintiffs, the initial contract signed by the parties was a standard employment agreement with no reference to retirement benefits.[4] Thereafter, upon a request by the plaintiffs to have their understanding with respect to retirement benefits reduced to writing, the defendant came up, not with a separate agreement relating thereto, but with a substitute employment agreement which contained a paragraph concerning retirement benefits (¶ 5).

---

4. Except for paragraph 9 which simply made a collateral reference to death benefits in a context without probative significance on the issue involved.

In these circumstances, "although form is not conclusive," there is no presumption that the substitute contract was meant to be an entire contract rather than a separable or divisible contract. *Cf.* Rudman v. Cowles Communications, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972). Nor is there plain language that makes the contract entire. *Cf.* Green v. Doniger, 300 N.Y. 238, 90 N.E.2d 56 (1949). In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances. *Id.*; see 6 Williston, Contracts (3rd ed.) § 863.

The plaintiffs contend that the intention was to vest their retirement benefits immediately as an inducement to them to begin their new employment immediately. They note that everyone understood that if they waited another month or two, their rights to retirement benefits at IBM would have vested. It was their intention, they assert, not to lose those rights about to vest by virtue of their ten years of employment by IBM. The purpose and intent of paragraph five of the substitute employment agreement, they say, was to insure that they would lose no rights that were about to vest shortly if they stayed with IBM. I have little doubt that this is just what the plaintiffs intended. We must inquire, however, whether the other contracting party understood that intention and agreed to it.

Such a manifestation of agreement would be evidenced either by the words used in the contract on an objective view, Peripheral Equipment, Inc. v. Farrington Mfg. Co., 29 A.D.2d 11, 13–14, 285 N.Y.S.2d 99 (1st Dept. 1967), or, if there be ambiguity, by considering the surrounding circumstances, including parol evidence. Rudman v. Cowles Communications, *supra,* 30 N.Y.2d at 13, 330 N.Y.S.2d 33, 280 N.E.2d 867.

At the threshold of inquiry we must look to the language used. That requires a look at the retirement plan to which reference is made in paragraph 5, set forth above.

The employee is entitled to benefits "at least equal" to those provided under the various plans [retirement] presently provided by LTVA to its own employees.

Among other benefits the LTVA plan provides:

"Section 5.5. A participant shall be eligible for a Deferred Vested Pension if his employment is terminated after he has completed 10 or more years of service." P. Ex. 27 at V–4.

At the time the plaintiffs left IBM, Bird was credited with 11.506 years of service toward the IBM retirement plan and Carter was credited with 13.114 years of service. It is obvious, therefore, that if the right to retirement benefits were intended to include the credits for IBM service the plaintiffs would be *immediately* eligible for LTVA retirement benefits, since they had served more than ten years when they entered the employ of CT.

Paragraph 5 says in so many words that *"both* Bird's *eligibility* for retirement benefits and the amount of his retirement benefit shall be determined first using his actual employment date of March 31, 1969 and then using an assumed employment date of October 13, 957." [5]

This could mean that because paragraph 5 provides for an assumed date of employment for "eligibility" as well as "amount," the provision regarding "eligibility" was inserted so that each plaintiff would become *immediately* "eligible" since each had already served with IBM more than the ten years required under the LTVA plan.

On the other hand, the linking of "eligibility" with an assumed date of service may be for a different purpose consonant with the defense theory. If we assume that the plaintiffs had finished their five year term and then resigned, unless the "eligibility" under the assumed service date were provided, they

5. Carter's assumed date was December 12, 1955.

would not have qualified yet for the LTVA plan, not having served ten years with CT.

Hence, the provision for "eligibility" as well as "amount" is consistent with the defendant's position that it merely wished to provide that the termination of the five year contract, if not renewed, would not harm plaintiffs' "eligibility" for retirement benefits.

We are thus left with a double ambiguity. (1) Was the retirement benefit to be separable from the obligations of the employment contract? and (2) was the provision for "eligibility" based on an assumed date inserted to provide plaintiffs with an immediate vesting of such benefits?

■■ The question of whether parol evidence may be admitted is a matter of substantive law. Higgs v. De Maziroff, 263 N.Y. 473, 477, 189 N.E. 555 (1934); see Plum Tree, Inc. v. N. K. Winston Corp., 351 F.Supp. 80, 83 (S.D.N.Y. 1972). And the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) governs. The parties agree that New York law controls, since negotiations took place in New York and New York was also the place of performance.

■ Strictly speaking, the parol evidence rule is not violated when the oral evidence does not alter or vary the writing or insert an additional term, but simply explains the meaning of a term or illuminates the consideration.

Despite the parol evidence rule, "[t]he consideration of a written instrument is always open to inquiry, and a party may show that the design and object of the agreement was different from what the language, if alone considered, would indicate." Baird v. Baird, 145 N.Y. 659, 664, 40 N.E. 222, 224 (1895), cited in Hutchison v. Ross, 262 N.Y. 381, 398, 187 N.E. 65 (1933).

"While oral proof of the promise made is not admissible, oral proof of facts from which the meaning of the written promise may be known is admissible. Marks v. Cowdin, 226 N.Y. 138, 123 N.

E. 139." Sun Oil Co. v. Heller, 248 N.Y. 28, 31–32, 161 N.E. 319, 320 (1928).

■ When the language of the agreement is patently ambiguous, the Court may look to prior negotiations to determine what was intended. Rudman v. Cowles Communications, *supra,* 30 N.Y. 2d at 11, 330 N.Y.S.2d 33, 280 N.E.2d 867; Restatement, Contracts §§ 238, 242 incl. comment a. See also Fleischman v. Furgueson, 223 N.Y. 235, 239, 119 N.E. 400 (1918).

Putting oneself in the position of the parties it is reasonable to assume that the plaintiffs would not have given up a sure thing unless they were to get something equivalent at once. They wanted to step right into another pair of shoes just like their old ones. If there was risk for them they would have waited until the IBM retirement plan became effective, and only then joined the new team.

It is unlikely that if it had been put to them that they had to work for five years to get into the same position, they would have assumed the risk.

■ In the unusual circumstances of these negotiations, asking the plaintiffs to abort their retirement rights at IBM which were so soon to fructify, and promising them a retirement status quo, meant that the contractual rights to retirement benefits were to vest at once. In its eagerness to recruit these plaintiffs the new employer either forgot to protect itself against the contingency of early resignation or, perhaps more likely, was afraid to put so dubious a proposal to the still uncertain prospective employees. To suggest early termination of what was being urged as a lifetime opportunity might chill their acceptance of the proposal. The modern Calypsos, the conglomerate recruiters, use familiar blandishments—capital gains, entrepeneurship, a "piece of the action"—which lure middle-aged people with families and secure jobs to leave for a voyage on uncharted seas. Good faith is not the issue, for men have often gone from large corporate set-ups to

newer ventures and there found ultimate profit. But in fairness, the obligation later undertaken should be measured by the promise earlier given. While words may not have been spoken with precision, part of the lure was the retirement benefit, and the insistence of the plaintiffs on its inclusion in the contract of employment was intended to insure the continuance of benefits about to accrue at IBM. Since the contract was drafted by the defendants, doubt as to its meaning should be resolved in favor of the plaintiffs. Moran v. Standard Oil Co., 211 N.Y. 187, 196, 105 N.E. 217 (1914). The failure of the new employer to define the effect of an employee's breach, in the circumstances of this case, supports the plaintiffs' position.

I find, accordingly, that the agreement to provide retirement benefits is divisible from the other terms of the employment and was intended to be effective upon entry into employment.

*III. Novation.* Bird and Carter's employment agreements were assigned to CT/East by assignments dated as of June 30, 1969 (Pl. Exs. 5, 20). The assignments recited that the "[employee's] employment by CT is being terminated coincident with his employment by CTE [CT/East] effective as of the date first above written." The assignments then provide: "Now, therefore, it is hereby agreed by the parties hereto that the Agreement, as amended, shall be assigned to CTE [CT/East] effective as of the date first above written and CTE [CT/East] shall assume in the place and stead of CT, all the rights, privileges, duties and obligations thereunder." Thereafter, Bird and Carter assumed their duties as President and Vice-President of CT/East.

Each assignment is signed by CT, CT/East and by the appropriate plaintiff. In the space provided in the assignment for LTVA's consent, the signature of LTVA was never affixed.

It will be recalled that in the employment contracts then in force (Exs. 3, 18) LTVA's signature appeared under the language: "The undersigned, LTV Aerospace Corporation, hereby unconditionally guarantees the performance by CT of the within obligations of CT."

CT now contends that the assignment to CT/East was a novation which released CT from *all* its obligations to the plaintiffs including the obligations of paragraph 5 with respect to retirement benefits. The plaintiffs, on the other hand, contend that the intention was merely to assign the rights and duties under the employment contract but not to assign the duty respecting retirement benefits, since that was a separate matter.

The language used is certainly that of novation and there is no doubt that CT was relieved of its obligation to employ the plaintiffs and to pay their salaries. Michelin Tire Co. v. Robbins, 173 App. Div. 955, 159 N.Y.S. 256 (4th Dept. 1916); Lane & Co. v. United Oil Cloth Co., 103 App.Div. 378, 92 N.Y.S. 1061 (1st Dept. 1905).

The difficulty with the position of CT is that the consideration for the retirment benefits provision was the immediate entry into employment by the plaintiffs, as I have found. Their dealings involving their retirement benefits were in the setting of employment in a conglomerate structure of huge resources. Hence, there was the requirement of the guaranty of performance by LTVA. While LTVA "consented" to the assignment, it failed to execute a guaranty of performance upon the assignment. The failure to execute a new guaranty makes it less than a novation. There is no conceivable reason why the plaintiffs should have accepted the obligation of retirement benefits, likely to accrue in about a quarter of a century, from a newly formed subsidiary, without retention of the obligation then existing, that of CT and LTVA.

Since the novation had to be consensual, I find that there was never assent by the plaintiffs to release CT from the obligation to pay retirement benefits to the plaintiffs.

*IV. Damages.* The plaintiffs allege that the defendant CT has advised each plaintiff that CT does not intend to pay him any retirement benefits and that this constitutes a repudiation and anticipatory breach. The complaint seeks money damages or specific performance.

The plaintiffs measure the money damages by the cost of purchasing an annuity plan comparable to the benefits provided under the existing LTVA retirement plan.

 The rule in New York is quite clear. Acceleration of future installment payments is not permitted where there has been an anticipatory breach, for the doctrine of anticipatory breach has no application to contracts for the payment of money only, in installments or otherwise. Medaris v. Lionel Corp., 25 A.D.2d 735, 268 N.Y.S.2d 936 (1st Dept. 1966); see also Schwartz v. Victory Container Corp., 294 F.Supp. 866, 868 (S.D.N.Y.1969).

The plaintiffs seek to escape this conclusion by suggesting that they are entitled to a pension, having reached the age of 40 years and that the refusal to pay two years of pension installments is a material breach. Even if the plaintiffs were entitled to such pension payments, the failure to pay an installment due would not in the absence of an acceleration clause, make the whole future sum due. Medaris v. Lionel Corp., *supra.* In fact, however, the plaintiffs were not eligible for a pension because they resigned before they had attained the age of 40. Article 5.3 of the LTVA retirement plan (P. Ex. 27) states: "A participant shall be eligible for an Early Pension if his employment is terminated with his Employer's consent on or after his 40th birthday." Bird was 39 when he resigned, and Carter was 38 when he resigned.

*V. Relief.* Bird and Carter are now 42 years of age. They will become entitled to retirement benefits at their option when they attain the age of 65 years (Retirement Plan 2.1(1)).

 I will declare the rights of the parties accordingly upon presentation on notice of an appropriate decree. Declaratory relief may be awarded although it is not prayed for in the complaint. Waterman v. Canal-Louisiana Bank And Trust Co., 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80 (1909); Dann v. Studebaker-Packard Corp., 288 F.2d 201, 216 (6 Cir. 1961); Fed.R.Civ.P. 54(c).[6]

If specific performance should be required at some later date, such relief may be applied for at the foot of the decree.

There was no evidence to support CT's counterclaim.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Submit judgment on notice.

---

6. The defendant now raises the question whether the matter in controversy exceeds $10,000. I find that on some theories of damage it does and that the matter in controversy exceeds the jurisdictional amount.