**LOCAL 1574, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Plaintiff,**

v.

**GULF & WESTERN MANUFACTURING CO. (EASTERN GROUP), Defendant.**

Civ. No. 14–97 SD.

United States District Court,
D. Maine, S. D.

June 25, 1976.

David M. Cohen, Gerald F. Petruccelli, Portland, Maine, for plaintiff.

Vincent L. McKusick, Everett P. Ingalls III, Portland, Maine, Stuart Alan Forman, New York City, for defendant.

**OPINION AND ORDER OF THE COURT**

GIGNOUX, District Judge.

In this action, plaintiff Local 1574, International Association of Machinists and Aerospace Workers, ("the Union") seeks to enforce the alleged right of its members pursuant to a collective bargaining agreement between the Union and defendant Gulf & Western Manufacturing Co. (Eastern Group) ("G & W") to receive retirement benefits over and above those provided for in the pension plan established by G & W. The Union seeks injunctive and declaratory relief, and attorneys' fees. Jurisdiction is predicated on Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1970).[1]

The action has been tried to the Court, without jury, and has been fully briefed and argued by counsel. The following opinion contains the Court's findings of fact and conclusions of law, as required by Fed.R. Civ.P. 52(a).

I.

The background of this dispute is as follows:

1. Prior to October 25, 1973, G & W, as successor to Bliss-Portland, a division of E. W. Bliss Co., owned and operated a manufacturing plant at South Portland, Maine ("the Rockwood facility"). In 1965 the Union, as exclusive bargaining agent for the employees with whom this action is concerned, negotiated with Bliss-Portland a collective bargaining agreement ("the 1965 Agreement"). Article XVI of the 1965 Agreement, dealing with retirement benefits, provided in full:

ARTICLE XVI

RETIREMENT BENEFITS

16.0 The Company agrees to provide the following retirement benefits to employees retiring after July 1, 1963.

A. NORMAL RETIREMENT BENEFITS

---

1. The parties have waived arbitration. *See Morales Rivera v. Sea Land of Puerto Rico, Inc.,* 418 F.2d 725 (1st Cir. 1969).

1. An Employee who retires from the Company after attaining the age of 65 and who on that date has 15 years or more of credited continuous service shall receive monthly benefits computed on the basis of $2.00 for each year of credited service, with a maximum of 25 years of credited service.

B. EARLY RETIREMENT BENEFITS

An employee who retires from the Company after attaining the age of 60, with 15 years or more of credited continuous service and prior to attaining age 65 shall receive Early Retirement Benefits equal to the Normal Retirement Benefits less one-half of 1% for each month he is under age 65 on the date of retirement.

C. DISABILITY BENEFITS

1. An employee who retires from the Company after attaining age 50 and prior to attaining age 65 as a result of a total permanent disability and who has at least 15 years of credited service and who shall have been totally and permanently disabled for six months, shall receive a Disability Benefit of $80.00 per month less any State and/or Federal disability benefit; with a minimum of $2.00 a month for each year of credited service, with a maximum of 25 years of credited service. Such disability benefits to be reduced to a Normal Retirement Benefit upon attainment of age 65.

D. VESTED DEFERRED RETIREMENT BENEFITS

1. An employee whose employment is terminated after he has attained age 50 who has 20 years of service shall be entitled to receive a Vested Deferred Retirement Benefit, computed on the basis of $2.00 for each year of credited service, upon the attainment of age 65.

16.1 The E. W. Bliss Company shall take such steps as are necessary to guarantee the payment for life of any monthly retirement benefit properly granted and paid during the term of this Agreement.

The 1965 Agreement contained no reference to a "pension plan."

2. Effective January 1, 1967, E. W. Bliss Co. established a pension plan ("the Pension Plan") covering the members of the Union employed at the Rockwood facility. The Plan was executed solely by officers of E. W. Bliss Co., without the participation or knowledge of Union representatives. It contained ten articles. Article I set forth the definitions of important terms used in the Plan. Articles II through V described in detail the method of determining employee eligibility for retirement benefits, the procedure for applying for benefits, and the method of computing benefits. Articles VI and VII related to the establishment and maintenance of the Trust Fund required by the Plan. Articles VIII and IX provided for the administration of the Plan by the company and for the nonalienability of employees' rights thereunder. Article X reserved to the company the right to modify or terminate the Plan[2] and set forth the order of priority for distributing the assets in the Trust Fund upon termination of the Plan if the Trust assets were insufficient to provide full benefits to all eligible employees.

Of present significance, Article VII of the Plan specifically limited the company's liability for retirement benefits upon termination of the Plan to the assets currently held in the Trust Fund. That Article provided, in paragraph 3:

3. The retirement benefits of the Plan shall be only such as can be provided by the assets of the Trust Fund, and there shall be no liability or obligation on the part of the Company to make any further contributions in the event of termination of the Plan. No liability for the payment of benefits under the Plan shall be imposed upon the Company, or the officers, directors or stockholders of the Company.

---

2. The Plan has been amended four times to reflect negotiated changes in retirement benefits and changes in the corporate identity of the employer. These amendments were dated, respectively, January 14, 1969, July 26, 1971, March 2, 1973, and April 6, 1973. The July 1971 amendment reflected the adoption of the Plan by G & W as successor to E. W. Bliss Co.

3. In 1968 the Union and Bliss-Portland executed a new collective bargaining agreement ("the 1968 Agreement") effective from May 9, 1968 through April 24, 1971. Article XVI of this agreement, relating to retirement benefits, contained provisions identical to those of the 1965 Agreement, except for changes in the amounts of and dates of eligibility for such benefits. The 1968 Agreement, like the 1965 Agreement, contained no reference to a "pension plan."

4. In the spring of 1971 the Union and G & W entered negotiations for a new labor agreement. Increased retirement benefits and a role in the administration of pensions were major demands of the Union. The negotiations failed, and the Union members went on strike for three weeks. The parties ultimately agreed upon a new collective bargaining agreement ("the 1971 Agreement"), effective from April 25, 1971 through April 24, 1973. Article XVI of this agreement, relating to retirement benefits, contained provisions identical to Article XVI of the 1965 and 1968 Agreements, with changes reflecting negotiated increases in retirement benefits.

The 1971 Agreement also contained the following two new provisions relating to retirement benefits, in Article XVIII:

18.18 Three (3) union representatives will be placed on the retirement committee.

18.18A The company will supply pension information pamphlets on or before July 15, 1971.

The 1971 Agreement contained no other references to a "pension plan."

5. On March 28, 1973 G & W announced its intention to phase out production at the Rockwood facility. On April 26, 1973 the Union and G & W executed an agreement ("the 1973 Extension Agreement") extending the 1971 Agreement until October 24, 1973 with amendments providing for a

wage increase of five percent retroactive to April 24 should the Rockwood facility remain open on October 24, and for severance pay for any employees laid off. The 1973 Extension Agreement further provided that it

shall not alter the rights or liabilities of the respective parties relative to retirement benefits.

6. At the close of business on October 24, 1973 G & W sold the Rockwood facility to a third party, unrelated to the instant litigation, and terminated the employment of all members of the Union. As of the following day, G & W terminated the Pension Plan and took the position that, according to the provisions of the Plan, retirement benefits would be paid only from the assets then in the Trust Fund. It is stipulated that as of the day the Rockwood facility was closed the Trust Fund did not contain actuarially sufficient assets to provide benefits in full to all Union members who might otherwise be eligible for pension benefits.[3]

It is the Union's position that the 1971 Collective Bargaining Agreement, as extended by the 1973 Extension Agreement, is the sole controlling document regarding the rights and liabilities of the parties with respect to retirement benefits, and that G & W is therefore obligated to pay in full to all eligible employees whose employment was terminated on October 24, 1973 the retirement benefits set out in Article XVI of the 1971 Agreement. The Union further argues that G & W's refusal to recognize its obligation to pay these benefits constitutes an anticipatory breach of its contractual obligation, and that the Union is therefore entitled to recover, as damages for a total breach of the contract, a lump sum equaling the present actuarial value of future benefits.

G & W contends that the Pension Plan is an integral part of the parties' under-

---

3. As of January 1, 1975, the Trust Fund contained assets of $171,445.93. The total annuity costs of all vested pension benefits under the Pension Plan is $699,549. It is stipulated that as of October 24, 1973, 173 employees and former employees had attained age 40 and had at least ten years accredited service and were

therefore entitled to vested deferred retirement benefits under Article XVI(D)(1) of the 1971 Agreement. Under the order of priorities provided by Article X of the Pension Plan for the payment of benefits on termination of the Plan, the assets of the Trust are insufficient to pay full benefits to this group of employees.

standing with respect to retirement benefits and that by virtue of Article VII, paragraph 3 of the Plan, G & W's obligation to pay benefits upon termination of the Plan is specifically limited to the amounts in the Trust Fund as of October 24, 1973. G & W further argues that even if the Court determines that G & W has a continuing obligation to pay in full the retirement benefits provided by Article XVI, the Union is not in this case entitled to immediate payment of lump sum damages under the doctrine of anticipatory breach.

For the reasons to be stated, the Court holds that G & W is obligated to pay the retirement benefits set out in Article XVI of the 1971 Agreement, as extended by the 1973 Extension Agreement, to all eligible employees whose employment was terminated on or before October 24, 1973; but that the Union is not entitled to lump sum damages for an alleged anticipatory breach of contract by G & W.[4]

## II.

Article XVI of the 1971 Collective Bargaining Agreement, as extended by the 1973 Extension Agreement, states flatly and without ambiguity that "the Company agrees to provide the following retirement benefits to employees retiring after April 24, 1971 . . ."; each subparagraph further provides that each eligible employee "shall receive" the appropriate benefit. This language is unequivocal, and the conclusion is unavoidable on the face of the contract that Article XVI imposes upon G & W an unconditional obligation to provide retirement benefits to former Rockwood employees in the full amounts set forth therein.[5]

G & W argues that the 1971 Agreement must be read in conjunction with the Pension Plan, including the provision of Article VII limiting G & W's liability to the assets in the Trust Fund, for five independent reasons: *first,* no complete integrated labor contract, setting forth the rights and liabilities of the parties, was ever executed by the parties in 1971; *second,* the Pension Plan is incorporated by reference in the 1971 Agreement; *third,* the 1971 negotiations were conducted and concluded with reference to the Pension Plan; *fourth,* the Union by its conduct following the 1971 negotiations confirmed that the Pension Plan was an integral part of the 1971 Agreement, accepted the Pension Plan as full performance of G & W's obligations under that Agreement, and is estopped from denying that the Pension Plan satisfies G & W's obligations under the Agreement; and *fifth,* the 1973 Extension Agreement, which was the labor contract in effect at the time the Rockwood facility was closed, requires reference to the Pension Plan, as well as the 1971 Agreement, to determine the parties' rights and liabilities with respect to retirement benefits. Each of these arguments will be separately considered.

■ 1. *The 1971 Agreement as an Integrated Labor Contract.* Late in the proceedings G & W raised the argument that the Union failed to show that the printed copy of the 1971 Agreement offered in evidence by the Union was ever executed by the parties. This argument was advanced after the company in its answer to the Union's complaint in this action had admitted that the parties had entered into a collective bargaining agreement in April

---

4. This disposition of the case makes it unnecessary to consider the Union's alternative contention that, even on G & W's view that the Pension Plan became an integral part of the contract between the parties, G & W has breached a correlative obligation adequately to fund the Trust established pursuant to the Plan.

5. Significantly, the form in which Article XVI states the company's obligations—"The Company agrees to provide . . ."—is consistent with the language used in the contract to describe other obligations of the company.

Thus, in Paragraph 15.5, the company "agrees to provide" benefits supplementing workmen's compensation. Moreover, in other clauses the drafters of the 1971 Agreement made explicit reference to extrinsic documents where they intended rights and obligations to be subject to them. For example, Paragraph 15.6 states:

> The provisions of this Article, regarding insurance, shall be governed by the terms of the contracts of the Insurance carriers mentioned herein.

1971, which contained Article XVI as it appears in the document offered by the Union, and after the printed copy, which was offered by counsel for the Union as "the Collective Bargaining Agreement of April 1971," had been received in evidence at the beginning of the trial, without objection by counsel for G & W. Not until the last day of the trial was there the slightest suggestion by G & W that the printed document thus received was other than the 1971 Agreement duly executed by the authorized representatives of both parties. Moreover, G & W admits execution by the parties of a Memorandum of Agreement dated May 11, 1971, which is plainly a series of amendments to the 1968 Agreement, the execution of which is also conceded. The latter two documents taken together clearly represent the integrated understanding of the parties as of April 1971, which was incorporated in the printed copy of the 1971 Agreement. In short, the record permits no conclusion other than that the printed copy of the 1971 Agreement represents a fully effective and integrated collective bargaining agreement, which, as extended by the 1973 Extension Agreement, governed the relations of the parties on the date the Rockwood facility was closed.

**2.** *Incorporation of the Pension Plan in the 1971 Agreement.* G & W has adduced two respects in which it contends the Pension Plan is incorporated by reference in the 1971 Agreement.

First, G & W argues that Article XVI of the 1971 Agreement was insufficient to establish a pension benefits program which could be administered for the Rockwood employee group. The company presented testimony by several witnesses that the provisions of Article XVI were ambiguous and required amplification and explanation in order to frame an administrable pension program.[6] Indeed, the Union concedes that the administrative provisions of the Plan (Articles I through V) were necessary to implement a satisfactory program. It does not follow, however, that the need for an effective administrative mechanism required that the Plan include a provision limiting the company's obligation to pay benefits in derogation of the express terms of the Collective Bargaining Agreement.[7]

*Drink & Distillery Workers of America, AFL–CIO v. Duke & Co.,* 373 F.Supp. 778, 782 (W.D. Pa.1974), aff'd mem., 510 F.2d 969 (3d Cir. 1975). In this case, however, the distinction is valid and of great importance. As the Union has pointed out, Articles I to V deal with matters of immediate concern to those entitled to receive benefits: they cover the questions of when and on what conditions a person becomes eligible for retirement benefits. Articles VI to X, on the other hand, deal with matters of primary concern only to the employer who is obligated to pay benefits. The Union therefore could have been reasonably expected to be far more aware of and concerned with the matters covered by the first five Articles of the Plan and to be unconcerned with and only dimly aware of the other Articles. The evidence fulfills this expectation. During the several events adduced by G & W to show Union acceptance of the limitation-of-liability provision of the Plan—the negotiations leading to the 1971 Agreement, the drafting and editing of the pamphlet distributed to Union members in the summer of 1971, and the meetings of the retirement committee—the Union consistently evidenced great interest and some understanding with respect to the matters covered by Articles I to V of the Plan but none with respect to the rest of the Plan. Under these

**6.** Thus, Lawrence N. Bader, a consulting actuary, testified:

[T]he Collective Bargaining Agreement merely outlines the benefits and there's a great deal of work yet to be done in terms of setting up the administrative mechanisms for the Plan. The job of determining and paying out benefits under that Collective Bargaining Agreement—the first step in administering it would be something much more akin to planned draftsmenship than to administration of a plan. There are several areas, such as definition of credited service, definition of total and permanent disability, form of payment of retirement benefits, establishment of a mechanism for disbursing benefits and for holding company contributions. In all these areas the Collective Bargaining Agreement gives no guidance.

**7.** The distinction here drawn between the subject-matter of Articles I to V of the Plan and that of the rest of the Plan may appear to be somewhat artificial. A workable retirement plan program could be expected to require not only provisions for determining eligibility for benefits (the matter covered by Articles I to V) but also provisions governing contributions to and administration of a trust fund (the matter covered by Articles VI to X). *Cf. International Union of United Brewery, Flour, Cereal, Soft*

Second, G & W argues that the two new provisions of the 1971 Agreement, providing for Union representation on a "retirement committee" and for distribution of "pension information pamphlets" (Paras. 18.18 and 18.18A, *supra*), effectively incorporated the entire Pension Plan in the Agreement. Analysis of the duties of the retirement committee and examination of the pamphlet disclose, however, that these provisions of the 1971 Agreement refer at most to the administrative provisions of the Plan and in no way can be said to incorporate the provisions of the Plan limiting the company's liability to pay full benefits.

■ In connection with defendant's contention that the Pension Plan is incorporated by reference in the 1971 Agreement, it should be noted that the case of *International Union of United Brewery, Flour, Cereal, Soft Drink & Distillery Workers of America, AFL–CIO v. Duke & Co.*, 373 F.Supp. 778 (W.D.Pa.1974), *aff'd mem.*, 510 F.2d 969 (3d Cir. 1975), adduced by the company, is palpably distinguishable from the present case. In *Brewery Workers* the court found "clear references to another document" in a collective bargaining agreement which provided, *inter alia*, that "[t]he Employer shall continue a pension plan . . . ." *Id.* at 780–81. The evidence in *Brewery Workers* further indicated that the pension plan had been established under a prior collective bargaining agreement, which had provided: "[t]he Employer shall establish a pension plan . . . ," and further, "[t]he details of the pension plan . . . shall be settled by agreement between the parties and by arbitration should they fail to agree." *Idem.* The Court concluded on these facts that a limitation-of-liability provision contained in the plan was clearly incorporated by the labor contract. This holding is hardly applicable to the instant case, where the Collective Bargaining

Agreement makes absolutely no express reference to the Pension Plan.

■ *3. The 1971 Negotiations.* G & W strenuously urges that evidence regarding the parties' actions and statements during the 1971 negotiations demonstrates that both parties understood that the company's obligation to pay pension benefits under Article XVI of the 1971 Agreement was limited by the limitation-of-liability provision of the Pension Plan. In light of this Court's determination that this provision of the Plan is inconsistent with unambiguous language of the written agreement adopted by the parties, it seems clear that, as the Union contends, the parol evidence rule precludes consideration of this evidence. *See* 9 Wigmore, Evidence § 2430 at 98–99 (3d ed. 1940); 4 Williston on Contracts §§ 631–33 (3d ed. 1961). Its consideration may also be barred by national labor policy, as forcefully expressed by Judge Phillips, concurring, in *Lewis v. Owens*, 338 F.2d 740, 743 (6th Cir. 1964):

> The purpose of written labor agreements is to settle questions which, if left unsettled, would lead to industrial strife. Variation of such written contracts by evidence of prior or contemporaneous oral agreements is contrary to national labor policy. In my opinion national labor policy requires that evidence of oral agreements be inadmissible to vary the provisions of written labor contracts.

*See Lewis v. Lowry*, 295 F.2d 197, 201–02 (4th Cir. 1961) (Sobeloff, C. J., dissenting), *cert. denied*, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962); *N.L.R.B. v. Gulf Atlantic Warehouse Co.*, 291 F.2d 475, 477–78 (5th Cir. 1961); *International Union of Brewery, Flour, Cereal, Soft Drink & Distillery Workers of America, AFL–CIO v. Duke & Co., supra*, at 783; *Local Union No.*

circumstances it would be unreasonable to extend Union actions suggesting acceptance of or acquiescence in Articles I to V to reach the remainder of the Plan. Further, Paragraph 16.1 of the 1965, 1968 and 1971 Agreements, which provides that G & W "shall take such steps as are necessary to guarantee the payment for life" of benefits once an employee begins receiving them, leaves it entirely up to G & W to decide how to provide this guarantee (whether, for example, by establishing a trust or by purchasing annuities): Paragraph 16.1 evidences Union interest in assuring receipt of benefits but none in the particular arrangements through which G & W might choose to meet its obligation to pay.

1987, International Brotherhood of Electrical Workers, AFL–CIO v. Control Products Co., 330 F.Supp. 250, 252–53 (W.D.Pa.1971), aff'd mem., 475 F.2d 1395 (3d Cir. 1973). But see Communication Workers of America v. Pacific Northwest Bell Telephone Co., 337 F.2d 455, 458–59 (9th Cir. 1964). This policy takes on added strength where the material provisions of the collective bargaining agreement are clear and unambiguous, as they are in the instant case. See Local 783, Allied Industrial Workers of America, AFL–CIO v. General Electric Co., 471 F.2d 751, 756–58 (6th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973). It is not necessary, however, to rely on these restrictive rules, as the extrinsic evidence advanced by the company fails to support its position.

■ G & W has advanced no statement, written or oral, by any Union member or representative during the 1971 negotiations which expressly recognized that the company's obligation to pay retirement benefits under Article XVI was limited to the assets of the Trust Fund. Nor does the evidence otherwise establish Union acceptance of the limitation-of-liability provision of the Pension Plan. The evidence clearly shows that during the 1971 negotiations the Union representatives had, at the very best, only a limited understanding of the purposes and principles of pension plans. According to the testimony of the company's own witnesses, the Union representatives first received a copy of the Plan during the 1971 negotiations, no earlier than March 15. Upon receipt of the Plan, the Union negotiating committee consulted an actuary, Robert J. Towne, who spent about two hours with them explaining what pension plans involve. Mr. Towne testified that the Union officials appeared completely unfamiliar

with the methods of establishing and implementing pension plans and that the purpose of the meeting was simply to help them understand their general character and to make a few observations on the G & W Plan. In this connection, he pointed out to the negotiating committee that the G & W Plan appeared not to comply with an Internal Revenue Service requirement that an explanatory pamphlet be distributed to employees, and that the Union, not being a party to the Plan, had no role in or control over its administration or over payment of funds into the Trust. He further testified that he did discuss the matter of "guaranteed funding," in the sense that sound actuarial principles require current funding of a pension plan to ensure future benefits. But he stated that the question of the company's liability for retirement benefits in the event of termination of the Plan did not arise during the meeting.

The record discloses that the Union representatives took Mr. Towne's advice to heart. In the 1971 negotiations they sought preparation and distribution of a booklet explaining the Plan, Union representation on a retirement committee, and "guaranteed funding." The first two of these objectives resulted in Paragraphs 18.18 and 18.18A of the 1971 Agreement, supra. The demand for guaranteed funding was rejected by the company and not incorporated in the Agreement. The record is clear, however, that neither the limitation-of-liability provision of the Plan nor the question of what would become of pension benefits should the company close the Rockwood facility was ever discussed by the parties during the 1971 negotiations.[8]

In view of the fact that the limitation-of-liability provision was not called to the attention of or discussed with the Union ne-

---

8. G & W points to statements made during Union meetings held prior to the ratification of the 1971 Agreement which, the company argues, show Union recognition that future payment of pension benefits was not "guaranteed." These statements appear, however, to refer only to the general principle, explained to Union representatives by Mr. Towne, that no pension benefit can prudently be regarded as "guaranteed" unless currently and fully funded.

The statements do not appear to be made with reference to the limitation-of-liability provision of the Pension Plan developed by G & W, and they by no means constitute the sort of express waiver required to show Union abandonment of rights accorded by the Collective Bargaining Agreement. See Radio Television Technical School v. N.L.R.B., 488 F.2d 457, 461 (3d Cir. 1973); N.L.R.B. v. Perkins Machine Co., 326 F.2d 488, 489 (1st Cir. 1964).

gotiating committee, and the committee's gross lack of familiarity with pension plans, it is apparent that the Union's 1971 negotiating position took for granted the status quo ante—that is, that the company was obligated to pay benefits—and was seeking new advantages—that is, a voice in the administration of the Plan and greater assurance that future benefits would be paid than it had under prior agreements. The company acquiesced to some extent in the first desire; but not in the second. The Union's failure to accomplish its second objective can hardly be said to indicate acquiescence in a worsening of its position. In light of these facts, the company's effort to derive support from the Union's knowledge of the Plan's existence during the 1971 negotiations must fail.

4. *The Union's Post-1971 Conduct.* G & W argues that the conduct of the Union following the 1971 negotiations confirms the parties' understanding that the Pension Plan was an integral part of the 1971 Agreement, shows the Union's acceptance of the Pension Plan as full satisfaction of G & W's obligations under that agreement, and constitutes an estoppel against the Union. Specifically, G & W points to the participation of Union representatives on the retirement committee, the part played by Union representatives in the preparation of the pension information pamphlet, and the awareness of Union representatives that the company was paying benefits to retirees and funding the Trust in accordance with the provisions of the Pension Plan. It is clear, however, that no conduct of Union representatives subsequent to the 1971 negotiations evidences Union acceptance of the Plan's limitation-of-liability provision.

■ The role of the retirement committee established pursuant to the 1971 Agreement was limited to administering the provisions of Articles I to V of the Pension Plan. The committee received and approved applications for pension benefits and determined the amount of benefits payable to each qualified applicant. G & W's witnesses admit that the committee was in-

volved in administrative matters only and had no role in the funding of the Trust, a matter which G & W continued to reserve solely to itself. They further concede that the sufficiency of the Trust assets was never discussed at any of the committee meetings; nor was any consideration given to the limitation-of-liability provision of the Pension Plan until April 1973, after the announcement of G & W's intention to close the Rockwood facility. In sum, the participation by Union representatives on the retirement committee in no way constituted acceptance by the Union of the limitation-of-liability provision of the Pension Plan.

■ Similarly, G & W can derive no support from the part played by Union representatives in the preparation and distribution of the pension information pamphlet required by the 1971 Agreement. The pamphlet was prepared by the company during the summer of 1971, submitted to Union representatives for review and correction, and printed and distributed to Union members by G & W. The subject matter of the pamphlet is limited to the same matters of administration that are covered by Articles I to V of the Plan. The pamphlet reviews in detail the requirements for eligibility for benefits, the amounts of benefits for which different categories of employees are eligible, and the procedures by which employees may make claims for benefits. The pamphlet makes no reference to the limitation-of-liability provision of Article VII of the Plan. The company points to disclamatory language in the pamphlet which informed Union members that the Plan is "[t]he document which directly controls your future retirement," and that "it is within the Plan that all the terms and provisions of your future retirement are carefully spelled out." But this language cannot fairly be interpreted as incorporating or showing Union acceptance of the limitation-of-liability provision of the Plan. The pamphlet presents the Plan as concerned solely with matters of entitlement to and amounts of benefits. It contains no suggestion that the company's obligation to pay the benefits it describes is limited to

the assets in the Trust Fund. Indeed, it trumpets:

*A Life-Long Income*
. . . will be paid to you under your Plan. You will receive a monthly check throughout your retirement, no matter how long you live.

■ Finally, the fact that G & W paid benefits under the Pension Plan and made contributions to the Trust Fund with the knowledge of the Union representatives on the retirement committee in no way constitutes acknowledgement by the Union that the company's obligation to pay benefits is limited to the assets in the Trust Fund. There is no evidence that the Union representatives at any time understood or acceded to the Plan's limitation of the retirement benefits due under the 1971 Agreement. The Union's awareness that the company was paying benefits and funding the Trust pursuant to the Plan does not indicate Union acceptance of the limitation-of-liability provision of the Plan.

■ On the present record, G & W has failed to show any statement, representation or conduct of the Union following the 1971 negotiations which evidences Union acceptance of the Pension Plan as satisfaction of the company's obligation to pay in full the retirement benefits provided by Article XVI of the 1971 Agreement or which constitutes grounds for an estoppel against the Union.

5. *The Status of the 1973 Extension Agreement.* The 1973 Extension Agreement states: "This extension shall not alter the rights or liabilities of the respective parties relative to retirement benefits." G & W argues that this language requires reference to both the 1971 Agreement and the Pension Plan. The Extension Agreement, however, refers expressly only to the 1971 Agreement and not to any other document. Moreover, the evidence is clear that in April 1973 the Union and G & W, both then represented by counsel, had reached an impasse on the pension funding issue prior to executing the Extension Agreement, and that the quoted language was plainly intended only to preserve the position of each

side and not to have any substantive effect relative to pension benefits.

\*　　\*　　\*　　\*　　\*　　\*

■ The Court holds that G & W is obligated to pay retirement benefits to Union members as they become eligible therefore under Article XVI of the 1971 Agreement.

### III.

■ The Union contends that G & W's refusal to recognize its obligation to pay in full the retirement benefits set out in Article XVI of the 1971 Agreement, as extended, constitutes an anticipatory breach of its contractual obligation, and that the Union is therefore entitled to recover, as present damages for a total breach of contract, an amount equal to the present actuarial value of future benefits. The Court is persuaded that the Union is not entitled to this relief for two independent reasons. First, on the termination of the Rockwood facility the parties' agreement regarding retirement benefits assumed the status of a unilateral contract for the payment of money, no further performance being required of the Union or its members. It is a tenet firmly established in the law of contracts that the doctrine of acceleration of damages following anticipatory breach does not apply to unilateral obligations for payment of money in the future. *See, e. g., New York Life Ins. Co. v. Viglas,* 297 U.S. 672, 678, 56 S.Ct. 615, 80 L.Ed. 971 (1936); *Roehm v. Horst,* 178 U.S. 1, 17, 20 S.Ct. 780, 44 L.Ed. 953 (1899); *John Hancock Mutual Life Ins. Co. v. Cohen,* 254 F.2d 417, 424–27 (9th Cir. 1958); *Barninger v. National Maritime Union,* 372 F.Supp. 908, 913 (S.D.N.Y. 1974); *Bird v. Computer Technology, Inc.,* 364 F.Supp. 1336, 1345 (S.D.N.Y.1973); 11 Williston on Contracts § 1326 at 146 (3d ed. 1968); Restatement (Second) of Contracts § 277, comment *c* (Tent. Draft No. 9, 1974).

Second, acceleration of damages is not appropriate where, as here, the dispute at issue arose not from the company's total repudiation of its pension obligations, or from an interpretation of these obligations based on "disingenuous pretense," *New*

*York Life Ins. Co. v. Viglas, supra,* at 678, but from an honest disagreement as to what those obligations are. G & W has stated that it will abide by the ultimate judicial determination in this case, and there is no evidence to indicate that it is not fully capable of doing so.[9] The company has at no time refused to pay any currently due retirement benefits, and there has been no suggestion that it will not make full payment of all benefits declared by the Court to be due in the future. In sum, Union members have suffered no actual loss to date, and the Union has not shown that acceleration is necessary at this time to protect its members' future rights.

 The Union also demands, as further relief, that the company pay its attorneys' fees. No such award in this case is authorized by statute or by a common fund theory. Nor is the Court persuaded that in forcing the issues to a judicial determination the company has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F. D. Rich Co. v. United States,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). The dispute arose from a genuine misunderstanding of the company's obligations, and the decision to go to court rather than to arbitrate was apparently initiated by the Union. Under these circumstances, an award of attorneys' fees would be inappropriate. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *de Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281, 292–93 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970).

IV.

 In accordance with the foregoing, judgment will be entered declaring that G & W is obligated to pay in full when due the retirement benefits set out in Article XVI of the 1971 Agreement, as extended by the 1973 Extension Agreement, to all eligible employees of its former Rockwood facility whose employment was terminated on or before October 24, 1973. In light of G & W's stated undertaking to abide by the ultimate ruling in this action, and its evident ability to do so, plaintiff's prayer for injunctive relief is denied.[10] In all other respects, plaintiff's claims for relief are denied. Plaintiff's counsel will prepare a proposed form of judgment, to be approved as to form by defendant's counsel and submitted for entry by the Court.

IT IS SO ORDERED.

---

**9.** The parties have stipulated that the defendant's parent corporation, Gulf & Western Industries, Inc., has assets (exceeding two billion dollars) adequate to meet the judgment entered in this case and will guarantee satisfaction of any judgment entered against the defendant.

**10.** If specific performance is required at some future date, the Union may apply for that relief at that time. *Cf. Bird v. Computer Technology, Inc., supra,* at 1345.