GENERAL ELECTRIC CAPITAL COR-
PORATION as successor in interest of
General Electric Credit Corporation,
Plaintiff,

v.

EVA ARMADORA S.A., Christina
Armadora, S.A., Defendants.

No. 88 CIV. 6013 (CBM).

United States District Court,
S.D. New York.

May 20, 1993.

Haight, Gardner, Poor & Havens by Mark C. Flavin, Alan Heblack, Andrea Fischer, New York City, for plaintiff.

Cardillo & Corbett by James P. Rau, and Lord Day & Lord, Barrett Smith by Gerald A. Novack, New York City, for defendants.

## OPINION

MOTLEY, District Judge.

## I. INTRODUCTION

This case involves a contract dispute. Defendants borrowed money from plaintiff to pay the debt on two ships that defendants owned. The parties are litigating the terms of the repayment of the loan.

In this action, plaintiff General Electric Capital Corporation ("GECC") is seeking from defendants, Eva Armadora S.A. and Christina Armadora S.A. ("Armadora"), approximately $2,400,000 which it claims is due it as the balance of the Special Interest Payment of the Loan Agreement entered into by the parties on February 28, 1986 (the "Loan Agreement").

The specific contract dispute between the parties concerns the calculation and amount of a contractually specified Special Interest Payment. Defendants Armadora rely on the language of the Loan Agreement between the parties and Addenda No. 1 and 2 thereto. Defendants contend that under the Special Interest Payment provision of the Loan Agreement as set forth in section 2.09 thereof, Armadora is entitled to certain listed deductions from the proceeds of the sale of its Vessels for purposes of computing the Special Interest Payment due GECC.

Plaintiff argues that in addition to the Loan Agreement and Addenda No. 1 and 2, this court must also look to a fourth agreement consisting of the October 27, 1987 letter from Mr. Gonzalez to Mr. Gurtler and the November 12, 1987 fax cover letter to Addendum No. 1 from Mr. Pappas to Mr. Gonzalez.

Prior to a bench trial, defendants submitted a Motion In Limine To Exclude Certain Evidence At Trial. Plaintiff opposed this motion and submitted its own Motion In Limine To Exclude Certain Evidence At Trial. The court heard oral argument on the Motions on November 30, 1992. During the course of the hearing on the motions, both parties waived their right to a jury on the record. (*See* Transcript of Hearing 11/30/1992 at 108). Upon hearing the motions, this court denied both plaintiff's and defendants' motions to exclude parol evidence, concluding that section 2.09 of the Loan Agreement was ambiguous. (*See* Transcript of Hearing 11/30/1992 at 65).

A bench trial commenced on January 4, 1993. At the close of the trial, the court reserved decision on all issues presented and requested the parties to submit Proposed Findings of Fact and Conclusions of Law. Based on the evidence presented at trial, the court makes the following Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

### A. *The Parties*

Plaintiff General Electric Capital Corporation ("GECC"), as successor in interest of General Electric Credit Corporation, is a finance company organized and existing under the laws of the State of New York with its principal place of business located in Stamford, Connecticut. (Complaint para. 2; Exh. 3, p. 1).

Defendants Eva Armadora, S.A. and Christina Armadora S.A. (collectively "Armadora") are corporations organized and existing under the laws of the Republic of Liberia. (Complaint para. 3).

At all relevant times, defendant Eva Armadora S.A. was the owner of the Motor Tanker EVA and defendant Christina Armadora S.A. was the owner of the Motor Tanker CHRISTINA (collectively the "Vessels")

each was built by the Astano Shipyard ("ASTANO") in Spain.

T. Peter Pappas is the President and principal of Armadora. Armadora is part of the "Pappas group" of shipping and real estate companies.

### B. *The Contentions of the Parties*

In this action, GECC is seeking to collect $2,434,554.58 which it claims is the balance due on a Special Interest Payment of $3,434,-554.58 arising out of the Loan Agreement between by the parties on February 28, 1986 (the "Loan Agreement"). (Exh. 3).

Under one theory, GECC relies on the Special Interest Payment provision of the Loan Agreement, section 2.09.

Alternatively, GECC maintains that its claim concerning prepayment of the loan is supported by a new agreement between the parties, allegedly found in an exchange of letters between the parties concerning prepayment of the loan in October 1987 and November 1987.

Armadora contends that the most it owes is $1,043,671. Armadora denies liability for the amount claimed by GECC, based on the Special Interest Payment provision of the Loan Agreement and the subsequently executed formal addenda to that agreement.

### C. *The Agreement*

In 1979 defendants contracted with a Spanish shipyard for the building of two tankers (subsequently named EVA and CHRISTINA) for a purchase price of $30,-000,000 per Vessel. During the construction of the Vessels, defendants paid $5,000,000 each toward the purchase price. The balance on delivery was covered by a shipyard arranged mortgage loan with a Spanish bank for $25,000,000 per Vessel on a no-recourse basis. Following delivery of the Vessels the loans were paid down by Armadora from the earnings of the Vessels to $20,000,000 each. (Tr. 366–67).

In 1984 the shipping market experienced a severe decline which caused Armadora to be unable to meet its debt service on the loans. (Tr. 259, 368). After the bank refused to grant a moratorium on payment of the loans as requested by Armadora, it went into default on the loans. Since the loans were on a non-recourse basis with no personal liability on Mr. Pappas's part, the bank would only have a right to foreclose on the Vessels. (Tr. 112–13, 368).

The shipyard commenced an action against both Eva Armadora S.A. and Christina Armadora S.A. in the United States District Court for the Southern District of New York. (Tr. 419).

In late 1985 Armadora and the bank reached an amicable settlement whereby Armadora agreed to pay $18,000,000 in satisfaction of the mortgages on the two Vessels, which represented the fair market value of the Vessels of $9,000,000 each. (Tr. 369). By this settlement the bank was able to obtain the full $9,000,000 market value of each Vessel without incurring any foreclosure expenses. Under this settlement agreement Armadora was to pay the $18,-000,000 to the bank in February 1986. (Tr. 369–70).

During 1985 and 1986 the shipping market was greatly depressed with commercial banks and other traditional sources of financing unwilling to make loans for the purchase or refinancing of vessels. (Tr. 6, 7, 371, 422).

In order to help fund this settlement Mr. Pappas sought to obtain financing and GECC was one of the lenders contacted. Paul Gurtler, a finance broker and President of Interlink, had been retained by Armadora to assist in obtaining the financing necessary to pay ASTANO. (Tr. 340–41). In late 1985, Mr. Gurtler approached GECC seeking financing for Armadora. (Tr. 7–11).

Mr. Gurtler met with Steven V. Gonzalez, then employed as a Marketing Manager with GECC. During that meeting Mr. Gurtler advised Mr. Gonzalez that Armadora was seeking a loan for the EVA and the CHRISTINA. (Tr. 340–41). At the conclusion of the meeting, Mr. Gurtler suggested a meeting between Mr. Pappas, the principal of Armadora, and Mr. Gonzalez. (Tr. 11).

Mr. Pappas subsequently met with Mr. Gonzalez and other GECC employees at GECC's offices in Connecticut in January

1986. (Tr. 11, 12). Thereafter he met alone with Mr. Gonzalez in a local bar-restaurant where they spoke for another 30–40 minutes over drinks. (Tr. 123, 262, 372).

At that meeting Mr. Pappas told Mr. Gonzalez that Armadora was in default of its obligations on the debt owed to ASTANO (Tr. 12, 13) and that Armadora was seeking financing of $9,000,000 for each Vessel for an aggregate loan of $18,000,000. (Tr. 422).

At this time each Vessel had a market value of $9,000,000; thus, Armadora was seeking financing equal to 100% of the value of each of these Vessels. (Tr. 422).

Mr. Pappas explained that in his view the market was severely depressed and that he foresaw that within the next three years the $9,000,000 value of each of the Vessels would appreciate by 100%. (Tr. 129, 371, 373). GECC agreed with this assessment of the market. (Tr. 372–74). Mr. Pappas further advised GECC that within the next three years he intended to sell the Vessels and capture this market rise. (Tr. 371–72, 375, 424). As an inducement to GECC for providing maximum financing, Mr. Pappas agreed to share with GECC 30% of this appreciation of the Vessels. (Tr. 222, 267). GECC concedes that this concept of speculating on the market value appreciation and a sale within the next three years was the conceptual underpinning of the profit sharing arrangement. (Tr. 13–14, 110, 127, 129, 131–32, 135, 222).

Mr. Pappas also advised Mr. Gonzalez that Armadora had entered into bareboat charters for each Vessel with Shell France. Each charter had a term of approximately three years. (Tr. 13; Exh. J1, J2). At this meeting they also discussed the basic terms of the loans concerning which there is no dispute, including the amount, regular interest rate, duration, security, etc. (Tr. 24, 262–63). The parties offer differing views on whether, in addition to the regular interest to be paid, GECC was to receive some sort of "equity" interest in the Vessels, as claimed by Mr. Gonzalez, or merely a "profit participation," as testified to by Mr. Pappas. (Tr. 18–19, 266–67, 375–76). The parties agree that the additional payment to GECC, whether characterized as an equity interest or profit participation, is described in the Loan Agreement as a Special Interest Payment.

Plaintiff asserts that Mr. Gonzalez explained to Mr. Pappas that, because of the high risk involved in this transaction, as evidenced by the request for financing equal to 100% of the current market value of the Vessels, the highly volatile shipping market, the existing default by Armadora on the then existing loans from ASTANO, and the fact that another vessel owned and operated by Mr. Pappas had been arrested by the Nigerian Government for an alleged theft of cargo, GECC would consider making this loan only if GECC received an "Equity Kicker" or "Equity Participation" in the Vessels. (Tr. 14, 17, 18).

The "Equity Kicker" or "Equity Participation" required by GECC was not interest calculated on the loan nor interest on interest, but was an additional and separate payment to GECC after the principal and interest on its loan to Armadora had been fully repaid. Plaintiff alleges that this Equity Participation was given GECC in return for the risks involved in the loan and represented GECC's interest in the transaction as a whole. The Equity Participation did not give GECC an ownership interest in or legal title to the Vessels. (Tr. 14–17, 220–22).

During that meeting Mr. Gonzalez claims that he explained to Mr. Pappas how GECC's Equity Participation would work and described several examples of an Equity Participation to Mr. Pappas. (Tr. 16–19).

## 1. Pre-Loan Negotiation Documents

In support of its claim, GECC contends that the provisions found in its proposal letter and commitment letter, sent before the Loan Agreement was negotiated or executed, should govern the parties' rights.

Mr. Gonzalez sent a Loan Proposal Letter, dated January 16, 1986, to Armadora. (Exh. 1). The Loan Proposal Letter memorialized the terms and conditions which had been discussed by Mr. Gonzalez and Mr. Pappas during their meeting at GECC, including GECC's Equity Participation. (Tr. 26, 27).

The Loan Proposal Letter was thereafter executed by Mr. Robert Miliaresis, an officer of Armadora, with the notation "Accepted and Agreed this 30th day of January, 1986" and returned to Mr. Gonzalez by Armadora on January 30, 1986. (Exh. 1).

Upon receipt of the Loan Proposal Letter duly executed and accepted by Armadora, Mr. Gonzalez made a presentation to the Credit Committee of GECC. The Credit Committee approved the proposal based upon the terms in the Loan Proposal Letter and authorized the issuance of a Loan Commitment Letter to Armadora. (Tr. 29).

A Loan Commitment Letter is a binding obligation by GECC to make a loan according to the terms and conditions set forth in its Loan Commitment Letter. (Tr. 29).

The Commitment Letter provided that it was not all inclusive and was subject to the negotiation of formal loan documentation satisfactory to the parties. (Exh. 2 at 4).

GECC issued a Loan Commitment Letter dated February 3, 1986 to Armadora which set forth the terms and conditions upon which GECC would lend $18,000,000 to Armadora. (Exh. 2). One of the enumerated terms and conditions was GECC's Equity Participation.

The Equity Participation, as set forth in the Loan Commitment Letter (Exh. 2 at 2), was identical to the terms and conditions of the Equity Participation set forth in the Loan Proposal Letter. (Exh. 1) (Tr. 30, 31, 431, 491–92).

The Loan Commitment Letter (Exh. 2) set forth the following relevant terms and conditions:

- A loan facility of $9,000,000 per Vessel, $18,000,000 in total;

- A loan term of three years;

- An interest rate of two and one-half percent over LIBOR for three month deposits determined quarterly, or, one and one-half percent above the prime commercial lending rate of Bankers Trust Company;

- No prepayment of the loan would be permitted during the term of the Bare-boat Charters on the Vessels, i.e., two years and eleven months.

In addition to the terms and conditions set forth above, the Loan Commitment Letter also set forth the Equity Participation required by GECC (Exh. 2 at 2):

GECC will receive a 30% equity interest in the Vessels and their earnings as follows: Prior to Loan Maturity, GECC shall be entitled to 30% of the proceeds received by each Borrower resulting from the sale, loss or constructive total loss of each Vessel after payment of all amounts owing and outstanding to GECC. Thereafter GECC shall be entitled to a 30% interest in the Cash Flow generated by each Vessel, less debt service related to the refinancing of the Balloon. Cash Flow shall include cash proceeds resulting from the operation, sale, refinancing in excess of the outstanding Balloon, loss or constructive total loss of the Vessel.

Although Mr. Pappas was not providing his personal guaranty, GECC did require certain security from Armadora, namely, First Preferred French or Liberian Mortgages on the Vessels acceptable to GECC and its Admiralty Counsel; Assignment of Insurances; Assignment of receivables under the Bareboat Charters together with a general assignment of hires covering future employment; and Pledge of Shares of Armadora. In addition, GECC required irrevocable Letters of Credit in the amount of $1,500,000 for each Vessel. (Exh. 2; Tr. 24).

The Loan Commitment Letter was thereafter executed by Mr. Robert Miliaresis, an officer of Armadora, with the notation "Accepted and Agreed this 12th day of February, 1986." The Loan Commitment Letter together with the required $30,000 deposit was then returned by Armadora to Mr. Gonzalez. (Tr. 31).

If the Special Interest Payment were calculated in accordance with the Equity Participation sections of the Loan Proposal and the Loan Commitment, GECC would be entitled to the Special Interest Payment in the amount claimed by GECC. (Tr. 428, 431, 432).

The parties, however, dispute whether these letters comport with the Special Interest Payment Provision of the subsequent Loan Agreement. (Tr. 240–41).

2.  Loan Agreement

Upon receipt of the executed Loan Commitment Letter and Armadora's deposit fee of $30,000, Mr. Gonzalez instructed GECC's counsel to begin preparing the necessary documents for the loan transaction. (Tr. 33).

A first draft of the Loan Agreement dated February 11, 1986 was prepared by GECC's counsel and circulated to Armadora and to Armadora's counsel. (Exh. D).

In the draft Loan Agreement (Exh. D) and in the final executed Loan Agreement (Exh. 3), the Equity Participation of GECC which had been set forth in both the Loan Proposal and Loan Commitment Letters was denominated "Special Interest Payment" and was contained in section 2.09 of the Loan Agreement. (Exh. 3 at 9; Tr. 36).

During the drafting of the Loan Agreement, the language in the first draft (Exh. D) of section 2.09 was revised by GECC to bring that section into conformity with the Equity Participation sections of the Loan Proposal and Loan Commitment Letters (Exhs. 1, 2) which had previously been accepted and agreed to by Armadora. (Tr. 229–31).

At the time that these letters were received at Mr. Pappas's offices he was out of the country on vacation. (Tr. 380, 428, 472). When Mr. Pappas checked in with his office by telephone, as was his practice, he spoke by telephone with Mr. Miliaresis, the corporate Secretary of Armadora and controller of the Pappas group shipping interests. (Tr. 379–80). Mr. Miliaresis read to Mr. Pappas the Equity Participation language. They discussed the fact that the provision was not only confusingly worded but also was not in accordance with Mr. Pappas's recollection of the conversation he had had with Mr. Gonzalez in their January 1986 meeting.[1] (Tr. 381–82, 429, 488–89). Mr. Pappas was not overly concerned with this wording, however, because of the understanding reached with Mr.

Gonzalez in their meeting concerning "profit participation in the upside of the vessels' value." (Tr. 382–84). He was confident that the profit sharing language would be clarified in the formal loan documentation and instructed Mr. Miliaresis to sign the letters. (Tr. 382–83, 429, 473–74, 489).

GECC's lawyers (Haight, Gardner, Poor & Havens) prepared the first draft of the Loan Agreement which was dated February 11, 1986 and sent it to Mr. Pappas's offices. (Exhs. C, D). That draft did not contain any Equity Participation language but did contain what was denominated as the "Special Interest Payment" provision. The draft did not provide for any deductions from the net sales proceeds. (Exh. D at 9).

Upon his return to the office on February 18, Mr. Pappas reviewed this draft and discussed it with Mr. Miliaresis. (Tr. 388–91, 475–77). During this discussion, Mr. Pappas told Mr. Miliaresis that the Special Interest Payment provision which dealt with the sale of the Vessels, section 2.09(a)(ii), was not correct because it did not allow for any deductions from the net sales proceeds. This first draft failed to give Armadora credit for its cost basis of $9,000,000 per Vessel. It also did not give credit for the other expenses which would be incurred or paid during the period of the GECC loan which formed a part of Armadora's cost basis. (Tr. 391). Mr. Pappas instructed Mr. Miliaresis, to whom Mr. Pappas entrusted the actual negotiations (together with Mr. Pappas's lawyers, Cardillo & Corbett), to make sure that the $9,000,000 cost basis of each Vessel along with the other relevant expenses would be deductible from the sales proceeds. (Tr. 476–77). In this way a "floor" would be established above which GECC would share. (Tr. 391, 394).

On or about February 20, a meeting was held at GECC's lawyers' office to discuss the first drafts of the loan documentation. (Tr. 141). In attendance were Mr. Miliaresis and Mr. Gonzalez and the respective counsel for the parties. (Tr. 142, 477–78). At this meeting Mr. Miliaresis told Mr. Gonzalez that the first draft of section 2.09 was inadequate

1.  Mr. Gonzalez concedes that GECC as a matter of policy did not take equity positions in its shipping loans. He so informed Mr. Pappas at their January 1986 meeting. (Tr. 220–21, 376).

because it failed to allow Armadora any deductions from the net proceeds of a sale of the Vessels. (Tr. 478–80). Mr. Miliaresis explained that Mr. Pappas's understanding of the profit sharing arrangement was that GECC would share in the appreciation of the Vessels at the time of sale over Armadora's cost basis. He insisted, therefore, that this provision would have to be revised to permit the deduction of the $9,000,000 per Vessel cost basis as represented by principal paid to GECC, interest paid to GECC and other expenses incurred or paid during the course of the loan. (Tr. 478–81).

Mr. Gonzalez denies that he agreed to allow Armadora to deduct from the net sales proceeds any principal or interest which had been paid to GECC from the monthly charter hire of the Vessels or any other deductions. (Tr. 239–40, 559–60). Mr. Gonzalez does concede, however, that during this meeting he reaffirmed that GECC was agreeable to Armadora deducting the outstanding principal balance paid to GECC at the time the loan was repaid. (Tr. 234–35). Mr. Gonzalez also admitted that as a result of this meeting, GECC's lawyers were instructed to redraft the Loan Agreement to allow for the deduction of the outstanding principal owed to GECC when the loan was repaid. (Tr. 230, 235–36).

On February 24, GECC's lawyers forwarded a second draft of the Loan Agreement. (Exhs. E, F). This redraft contained a revised section 2.09. (Exhs. F at 9). The relevant language in the revised section 2.09 is similar to the language found in the final Loan Agreement. In this redraft, subdivision (ii) of section 2.09 contains newly added language that provides for various deductions from the net sales proceeds, including "any" principal and interest due on debt owed by Armadora. In the second draft, GECC's counsel indicated the changes made in the first draft by underlining:

(ii) On the date of sale or Loss Payment Date respecting a Vessel, 30% of the excess of (x) the total gross proceeds received from the sale, loss or other disposi-

tion of such Vessel received by the relevant Borrower over (y) the *aggregate of (A)* the amount of expenses paid or incurred by such Borrower and directly related to the sale, loss, or other disposition of the Vessel *and (B) any amounts due which are described in clauses (i) through (vi) of the definition of Excess Income.* (Exh. F at 9).

The Excess Income deductions to be made were provided in the second draft as follows:

(i) commissions payable to independent charter brokers, (ii) operating expenses directly related to such Vessel *including drydocking expenses paid by the relevant Borrower under the Bareboat Charter,* (iii) management fees due to a manager under a management contract approved by GECC, (iv) principal and interest paid *for the relevant period* in respect of any outstanding indebtedness respecting such Vessel, (v) any amount required to maintain a minimum working capital as required by any financing *institution* or reasonably required by any prudent business practices, and (vi) any contributions to capital respecting the relevant Borrowers.[2]

Both Mr. Miliaresis and Mr. Pappas testified that they believed that by the above changes in the first draft of the loan which were contained in the final Loan Agreement, GECC gave Armadora the deductions it had requested during the loan documentation negotiations, including the right to deduct all principal and interest paid to GECC. (Tr. 393, 481–82).

Prior to finalization of the Loan Agreement, Mr. Miliaresis suggested through counsel the addition of the words "or paid" to the Special Interest Payment clause. (Tr. 503–04). The purpose of the inclusion of the phrase "or paid" in this clause of the contract was to make clear that Armadora could deduct each of the items contained in parts (i) through (iv) not only if due, but if already paid. (Tr. 503–04). The proposed wording to section 2.09 which was agreed to and is contained in the final version of the Loan Agreement reads as follows:

---

**2.** On February 26, several minor changes in the above wording of the Excess Income deductions were made including the transfer of sub-points

(v) and (vi) from this clause to elsewhere in the Loan Agreement. (Exhs. G, H; Tr. 158)

Section 2.09 *Special Interest Payment* (a) After the principal of, and interest at the Interest Rate, on a Note and any other amounts required by Section 2.08(b) have been repaid or prepaid in full, subject to Section 2.09(c), (d) and (e), the Borrower shall pay to GECC, as additional interest ("Special Interest Payment") on the Loan in respect of which such Note was issued:

(i) On each Special Interest Payment Date an amount equal to 30% of Excess Income, if any, for the Vessel related thereto for the period from the preceding Special Interest Payment Date to such Special Interest Payment Date, and

(ii) On the date of sale or Loss Payment Date respecting a Vessel, 30% of the excess of (x) the total gross proceeds received by the relevant Borrower over (y) the aggregate of (A) the amount of expenses paid or incurred by such Borrower and directly related to the sale, loss, or other disposition of the Vessel and (B) any amounts due or paid which are described in clauses (i) through (iv) of the definition of Excess Income. (Exh. 3 at 9).

The language in the definition of Excess Income which section 2.09 incorporates by reference reads as follows:

(i) commissions paid to independent charter brokers, (ii) operating expenses directly related to such Vessel under the Bareboat Charter, (iii) management fees due to a manager under a management contract approved by GECC, (iv) principal and interest paid for the relevant period in respect of any outstanding indebtedness respecting such Vessel. (Exh. 3 at 2–3).

The basic terms of the Loan Agreement which are not in dispute can be briefly stated. GECC loaned each defendant $9,000,000. The duration of the loan was 2 years 11 months, with a balloon payment at the end. The interest rate was either 2½% over LIBOR or 1½% above the prime rate of commercial banks at the time. (Tr. 32). The loan was secured by the two ships owned by Armadora, all the earnings of those Vessels (net of broker's commissions) amounting to approximately $125,000 per month each, and two letters of credit in the total amount of $3,000,000. Mr. Gonzalez testified that this

level of security made him feel "totally secure" in making the loan. (Tr. 115–16). The Loan Agreement also provides that it should be construed in accordance with and governed by the laws of the State of New York. (Exh. 3 at 27).

3. The Refinancing

The Vessels operated uneventfully for the next 18 months under the charters with Shell Oil with all net hire going to GECC to pay the principal and interest on the loan. (Tr. 39). The relations between the parties, however, became strained leading to Mr. Pappas's disenchantment with GECC. In the summer of 1987 Mr. Pappas requested that GECC relieve Armadora of the obligation to maintain the $3,000,000 in letters of credit. (Tr. 39). The shipping market had improved substantially and the value of the Vessels, which were the primary security for the loan, had increased substantially from $9,000,000 each to in excess of $13,000,000 each. (Tr. 38). Mr. Pappas believed that the ships themselves now provided sufficient security for the loan. Although GECC initially reacted favorably to the proposal, it subsequently notified Mr. Pappas that it would not release the letters of credit. (Tr. 40–41, 438).

Additionally, one of the reasons Mr. Pappas had chosen GECC over the other lenders offering financing in 1986 was the expectation that they would develop other business together. (Tr. 134). Mr. Gonzalez agrees that in their January 1986 meeting he had expressed his hope to Mr. Pappas that the relationship would broaden and GECC and Mr. Pappas would do other business together. (Tr. 133–34). However, when Mr. Pappas approached GECC with other business, they declined. (Tr. 42, 134). Consequently, Mr. Pappas decided to terminate Armadora's relationship with GECC. (Tr. 343, 438).

In late September 1987 Mr. Pappas contacted Mr. Gurtler to intervene on Armadora's behalf in order to try to find a mutually acceptable way to terminate the relationship with GECC. (Tr. 42–43, 269, 343). In these discussions Mr. Gurtler acted as an intermediary between Mr. Pappas and Mr. Gonzalez. It is undisputed that Mr. Gurtler had no

**1538**

authority to bind Armadora (or Mr. Pappas) to any agreement. (Tr. 170–71, 270, 346).

On September 30, 1987 Mr. Gurtler met with Mr. Gonzalez to discuss the terms of prepayment and winding up. (Tr. 44, 344). The two basic ways Armadora could raise the funds to prepay the loan was by a sale of the vessels or by refinancing.[3] (Tr. 395). A refinancing, however, would not have ended GECC's interest in the Vessels for purposes of the Special Interest Payment. (Tr. 161). The parties agreed to treat the Vessels as if sold at their current market prices for purposes of the Special Interest Payment. (Tr. 344, 163).

During October 1987 Mr. Gurtler and Mr. Gonzalez had a number of telephone conversations which Mr. Gurtler confirmed contemporaneously by letter to GECC. (Exhs. S, T & 4). The principal issue discussed was the valuation of the Vessels and whether the parties would simply agree as to a value or would first obtain brokers' valuations. It was ultimately decided to obtain the valuations and based on these the parties agreed on a value of $13,200,000 per Vessel for a total deemed sales price of $26,400,000. Also discussed were the details of payment concerning the timing of both the Special Interest Payment and prepayment of the loan, as well as security for the Special Interest Payment. GECC wanted payment in 1988, rather than 1987, for tax reasons. (See Tr. 56). Armadora was agreeable to this. With regard to security, it was decided that Mr.

Pappas would give his personal guarantee and any other security required as agreed upon subsequently. (See Tr. 56–57).

Mr. Gurtler recapitulated the above discussions and set forth the parties current positions in his letter of October 15, 1987 to Mr. Gonzalez. (Exh. 4). In none of these prior conversations (or letters) did the parties discuss the method by which the actual calculation of the Special Interest Payment would be made. (Tr. 347). The October 15 letter did state, however, that the 30% "profit sharing" "as described in the loan documentation" would be paid not later than 180 days after refinancing. (Exh. 4, ¶ c). Mr. Gurtler also proposed in this letter that a "settlement agreement" be prepared by Mr. Pappas's lawyers.

By this time each of the Vessels had increased in value by some $4,000,000 to over $13,000,000 each. Armadora refinanced the GECC loan and used the refinancing proceeds to repay the outstanding balance due on the loan. At this time GECC and Armadora entered into an agreement, Addendum No. 1, that they would deem the refinancing to be a sale at what the parties agreed was then the market value of the Vessels or a total sales price of $26,400,000 ($13,200,000 per Vessel).[4] This dispute arises because the parties disagree on what expenses can be deducted from this $26,400,000 before calculating GECC's 30% share pursuant to the Special Interest Payment provision.

---

**3.** The Loan Agreement provided in section 4.02(a) that Armadora "will not sell its Vessel[s] without the prior written consent of GECC (such consent not to be unreasonably withheld) whether or not all amounts due to GECC pursuant to the Notes have been paid in full." (Exh. 3 at 15) Mr. Gonzalez concedes that it was understood that GECC would consent to a sale of the vessels as long as they were sold at a price reflecting their fair market values. (Tr. 110) Similarly, section 2.08(c) of the Loan Agreement provides that there will be no voluntary prepayment without the written consent of GECC. (Exh. 3 at 9)

**4.** It should be noted that subdivision (i) of section 2.09 dealt with the situation where Armadora had refinanced its loan and continued to own and operate the Vessels for some period of time before they were ultimately sold. Section 2.09(i) provides: "On each Special Interest Payment Date an amount equal to 30% of Excess Income,

if any, for the Vessel related thereto for the period from the preceding Special Interest Payment Date to such Special Interest Payment Date" (Exh. 3 at 9). At certain points during the hearing on the motions, plaintiff argued that this clause was also applicable. (Transcript of Hearing 11/30/1992 at 15). The parties, however, agreed in Addendum No. 1 to treat the refinancing of the GECC loan as a sale to a third-party for purposes of the Special Interest Payment rather than a refinancing. (Tr. 105). Thus, the parties effectively agreed that any further revenues from the operation of the vessels would not trigger subdivision (i) because the Vessels would be deemed to be no longer owned by Armadora.

Mr. Gonzalez conceded at trial that subdivision (i) formed no part of GECC's calculation and claim against Armadora. (Tr. 81–82). Nevertheless, plaintiff's earlier claims to monies under this section contributed to the court's finding ambiguity in the contract.

Armadora contends that, pursuant to section 2.09, it is entitled to deduct from the deemed sales proceeds all principal and interest paid to GECC, together with the additional deductions specified in the definition of Excess Income (sales expenses, charter broker commissions, operating expenses and management fees). In addition, Armadora contends that it is entitle to deduct expenses paid in connection with the GECC loan pursuant to section 2.09(e). (Exh. 3 at 10). That section provides that before any Special Interest Payment is made to GECC, Armadora is entitled to be repaid the amount of any capital contributed after the loan was made by GECC. Armadora's deductions total $22,921,097 and result in a Special Interest Payment to GECC of $1,043,671. (Exh. QQQQ).

GECC maintains the only deduction allowed under the Loan Agreement as demonstrated by GECC's calculations is the deduction of the outstanding principal of the GECC loan at the time it was repaid. (Exh. 11; Tr. 76–79).

### 4. The Gonzalez and Pappas Letters

Alternatively, GECC has argued that the Loan Agreement was superseded by a new agreement embodied in an October 27, 1987 letter from Mr. Gonzalez to Mr. Gurtler and a November 12, 1987 fax coverletter from Mr. Pappas to Mr. Gonzalez.

Plaintiff asserts that following the initial negotiations concerning the deemed sale, Mr. Gurtler, by letter dated October 15, 1987 to Mr. Gonzalez (Exh. 4), recapitulated the discussions with Mr. Gonzalez and, in particular, stated: (i) GECC would consent to a refinancing of the Vessels by Pappas; (ii) for purposes of the transaction each Vessel would be valued at $13,200,000 for a total of $26,400,000; (iii) the Special Interest Payment would be paid 180 days after the refinancing date; (iv) Mr. Pappas' counsel would prepare the appropriate document.

In response to that letter, Mr. Gonzalez sent at letter, dated October 27, 1987, to Mr. Gurtler (Exh. 5) in which Mr. Gonzalez stated his "understanding of the current state of negotiations" and agreed that Mr. Pappas's counsel should "prepare a written agreement for GECC's review and execution." (Exh. 5). He confirmed GECC's consent to voluntary prepayment by Armadora between January 1, 1988 and June 30, 1988 with GECC's Special Interest Payment—as secured by Mr. Pappas's guaranty—due within 180 days of prepayment.

The Special Interest Payment in Mr. Gonzalez's October 27 letter was calculated as 30% of the difference between the "deemed sale" price, *i.e.*, $26,400,000, less the aggregate outstanding principal balance on the GECC Loan on the date of prepayment (Exh. 5 ¶ c):

> The amount of the 30% "Special Interest Payment" referred to in the Loan Agreement shall be fixed at 30% of the difference between $26.4MM (the average of the attached valuations provided by LQM Associates Corporation and H. Clarkson and Company on the Vessels "EVA" and "CHRISTINA") less the aggregate loan principal balance on the Vessels on the date of prepayment.

At trial, Armadora's principal, Mr. Pappas, conceded that if the methodology employed in the Gonzalez letter of October 27 (Exh 5) represented the final agreement of the parties, then GECC is entitled to the Special Interest Payment as calculated by GECC. (*See* Tr. 440).

Shortly after sending that letter (Exh. 5) to Mr. Gurtler, Mr. Gonzalez had a telephone conversation with Mr. Gurtler concerning the calculation of the Special Interest Payment. At trial Mr. Gurtler recalled that conversation as follows (Tr. 349–50):

Q. What was said during this telephone conversation?

A. The conversation was to the effect that we would go ahead and prepare an addendum, that we would like the wording in the addendum to track the loan agreement as far as calculation of the special interest payment was concerned.

Q. Was there any mention of deductions?

A. Initially Mr. Gonzalez said something to the effect that as long as we get our three million, that's fine.

Q. What did you say?

A. I said, well, the loan agreement does provide for certain deductions.

Q. Was there anything else said about that?

A. I think Mr. Gonzalez said something to the effect that those were of a minor nature. And I said, well, what ever they turn out to be, we want them, because they are provided for.

Q. Did you agree with him that they were minor?

A. I didn't. I didn't comment one way or the other.

Mr. Gonzalez also advised Mr. Gurtler that he wanted a response to his letter directly from Mr. Pappas. (Tr. 57–58).

Thus, shortly after receiving Mr. Gonzalez's October 27 letter, Mr. Gurtler sent a copy to Mr. Pappas. (Tr. 347, 397). Armadora refused to agree to the changed methodology set out in the October 27 letter. Mr. Pappas informed Mr. Gurtler that paragraph (c) of this letter was not correct as it did not track the language of the Special Interest Payment provision of the Loan Agreement. (Tr. 347–48, 399). Mr. Pappas stated that there were a number of deductions that Armadora was entitled to under the Loan Agreement and that it was not his intention to give up any of these. (Tr. 359, 441–42). He told Mr. Gurtler, therefore, to advise GECC that Armadora would not agree to paragraph (c) and that the settlement agreement or addendum would have to track the Loan Agreement. (Tr. 348, 399).

Between October 7 and November 12, 1987 Mr. Gurtler spoke by telephone to Mr. Gonzalez and told Mr. Gonzalez that Mr. Pappas wanted the wording in the addendum to track the wording of the Loan Agreement as far as the Special Interest Payment was concerned because certain deductions were provided for therein. (Tr. 349–50). Mr. Gurtler testified that Mr. Gonzalez was agreeable to having the Special Interest Payment calculated pursuant to the terms of the Loan Agreement and that Mr. Pappas's lawyers should go ahead and prepare the addendum. Mr. Gonzalez does not deny having such a conversation with Mr. Gurtler. (Tr. 176–77).

Following this conversation, Mr. Gurtler called Mr. Pappas and reported to him that Mr. Gonzalez agreed to have the addendum track the Loan Agreement. (Tr. 350–51, 399–400, 442). Based upon that conversation, Mr. Pappas had his lawyers prepare an "Addendum No. 1 to Loan Agreement dated as of February 28, 1986 among General Electric Credit Corporation and Eva Armadora S.A. and Christina Armadora S.A." (Exh. X; Tr. 400).

On November 12, Mr. Pappas transmitted a draft of Addendum No. 1 (Exh. 7), along with a fax coversheet (Exh. 6), to Mr. Gonzalez for his review. The November 12 fax coverletter reads as follows:

DEAR STEVEN:

ATTACHED IS AN ADDENDUM TO THE LOAN AGREEMENT DATED FEBRUARY 28, 1986 AMONG GECC EVA ARMADORA AND CHRISTINA ARMADORA DRAWN BY OUR ATTORNEYS.

THIS ADDENDUM FORMALIZES THE AGREEMENT WHICH WE HAVE REACHED AS RECAPITULATED IN YOUR LETTER ADDRESSED TO MR. PAUL GURTLER DATED OCTOBER 27, 1987.

I AM FORWARDING TODAY BY FEDERAL EXPRESS THREE SIGNED ORIGINALS OF WHICH PLEASE RETURN *TWO* DULY EXECUTED BY AN AUTHORIZED GECC OFFICER AT YOUR EARLIEST CONVENIENCE.

BEST REGARDS,

T. PETER PAPPAS

(Exh. 6).

According to GECC, Mr. Gonzalez's October 27 letter was an offer which was accepted by Mr. Pappas's November 12 fax coverletter. Under this alleged agreement, GECC asserts that the only deduction permitted is for the outstanding principal owed to GECC at the time the loan was repaid, *i.e.,* $14,951,-484.

GECC calculates that with this being the only deduction, the Special Interest Payment due to GECC is $3,434,554.58. (Exh. 11). Most of the difference between the Armado-

ra and GECC calculations results from the fact that GECC was paid approximately $6,000,000 in principal and interest during the two years of the GECC loan preceding prepayment. Since under GECC's methodology none of this previously paid principal and interest is deductible while under Armadora's methodology all of the previously paid principle and interest is deductible, the result is a difference of almost $2,000,000 more being payable to GECC under GECC's reading than under Armadora's reading. The balance of the difference between the parties turns on whether the other deductions taken by Armadora are permissible. These additional deductions amount to some $1,800,000 and account for a difference in the Special Interest Payment of approximately $500,000.

### 5. Addendum No. 1

In accordance with Mr. Pappas's understanding, GECC was agreeable to having the Special Interest Payment calculated in accordance with the methodology in Loan Agreement Addendum No. 1 which reads, in pertinent part, as follows:

3. With respect to the Special Interest Payment provided for in Section 2.09 of the Loan Agreement this transaction shall be treated as a sale to a third party on the date of prepayment with the sale price fixed at $26.4 million (the average of the valuations provided by LQM Associates and H. Clarkson & Co. on the vessels EVA and CHRISTINA).

\*    \*    \*    \*    \*    \*

5. All other terms and conditions of the Loan Agreement dated as of February 28, 1986 shall remain in full force and effect. (Exh. X).

Shortly after reading Addendum No. 1 on November 12, Mr. Gonzalez claims that he telephoned Mr. Miliaresis to ask him why the Addendum did not track his calculation formula as set forth in paragraph (c) of his October 27 letter. (Tr. 177–78, 188–89, 483, 485). Mr. Gonzalez concedes that Mr. Miliaresis told him that Mr. Pappas wanted the Addendum "to track the language of the loan

agreement." (Tr. 190). Mr. Gonzalez further testified that during his conversation with Mr. Miliaresis he had pulled out the Loan Agreement and specifically reviewed the Excess Income definition to see the deductions being referred to by Mr. Miliaresis. (Tr. 191).

Mr. Gonzalez claims, and Mr. Miliaresis denies, that Mr. Miliaresis said that these were only minor deductions. Plaintiff asserts that after receiving the November 12 coverletter and Addendum No. 1 from Mr. Pappas, Mr. Gonzalez spoke to Mr. Miliaresis concerning a minor revision which GECC had to a provision of the Addendum which did not affect the Special Interest Payment provision. (Exh. 7; Tr. 65–66).

Plaintiff claims that during that conversation Mr. Miliaresis advised Mr. Gonzalez that Mr. Pappas wanted the opportunity to discuss with GECC some minor deductions. (Tr. 66–67). At no time during that conversation did Mr. Miliaresis specifically tell Mr. Gonzalez that Mr. Pappas wanted to deduct the entire amount of the principal and interest paid to GECC on the underlying loan. (Tr. 510–11).

It is undisputed that Mr. Gonzalez was told, understood, and agreed that the provisions of the Loan Agreement were to govern the calculation of the Special Interest Payment. (Tr. 190, 483–84, 508–09).

On January 21, 1988, during a telephone conversation, Mr. Miliaresis told Mr. Gonzalez, who was in London, that Armadora wanted to deduct the entire amount of the principal ($18,000,000) and interest ($3,000,000) paid to GECC, i.e., an aggregate $21,000,000. This conversation was the first time that anyone at Armadora had advised GECC of the specifics of Armadora's disagreement with the methodology for calculating the Special Interest Payment which was contained in the Gonzalez letter of October 27, 1987. (Tr. 69–71).

GECC conceded that Addendum No. 1 was not signed by GECC until November 17, 1987.[5] (Exh. X; Tr. 65, 198). This was after

---

5. It should be noted that GECC wanted to make a change in one of the paragraphs of the adden-

dum transmitted by Mr. Pappas on November 12. This proposed modification, which did not

Mr. Gonzalez had been told by both Mr. Gurtler and Mr. Miliaresis that paragraph (c) was unacceptable to Mr. Pappas and that the original Loan Agreement would have to govern.[6] (Tr. 178, 192).

### 6. Addendum No. 2

In January 1988 Armadora was prepared to repay the loan to GECC and was ready to close on the refinancing of the EVA and CHRISTINA with the Royal Bank of Scotland and Bank Paribas (Suise) S.A., each of which were financing a Vessel. (Tr. 449–50; Exh. IIII). In dealing with the security to be required for the Special Interest Payment, a dispute arose between the parties as to the amount due with respect to the Special Interest Payment. (Tr. 449; Exhs. LLLL). Armadora's position was that the Special Interest Payment is no more than approximately $1,000,000 when the deduction provided for in the Loan Agreement are taken into account. GECC claimed, however, approximately $3,400,000 due as Special Interest Payment which Armadora contended did not give effect to the deductions set forth in the Loan Agreement. (Exh. 8).

The parties continued to negotiate in January through February 1988 to see if they could agree on the amount of the Special Interest Payment so that the refinancing could go forward. GECC was insisting at this time that Armadora agree to its amount or it would not allow the refinancing. (Exh. 8; Tr. 208–09).

Upon his return from London, Mr. Gonzalez sent a letter, dated January 28, 1988, to Mr. Pappas (Exh. 8), which reiterated GECC's demand for payment of the sum of approximately $3,400,000 as GECC's Special Interest Payment.

In response, Mr. Pappas sent a letter to Mr. Gonzalez dated January 29, 1988 rejecting GECC's demand. (Exh. 9). Mr. Pappas also advised Mr. Gonzalez that if Armadora's refinancing was cancelled because of GECC's demands, Armadora would hold GECC responsible. (Tr. 74).

If GECC carried out its threat and blocked the refinancing, Armadora would have incurred damages for breach of commitments that were issued by the two banks. (Tr. 450). Nevertheless, Mr. Pappas refused to agree to any computation of the Special Interest Payment that was not based on the provisions of the Loan Agreement.

When an agreement could not be reached as to the amount of the Special Interest Payment, it was agreed that the loan to GECC would be repaid and that Armadora would provide security to GECC for the full amount of the Special Interest Payment as claimed by it until the actual amount due could be amicably settled or determined by litigation. This agreement was embodied in Addendum No. 2 to the Loan Agreement. (Exh. AA). Under Addendum No. 2, $3,400,000 in security was provided consisting of $3,000,000 in letters of credit and the $400,000 personal guarantee of Mr. Pappas. Since Armadora did not contest the $1,000,000 payment as Special Interest, the first letter of credit provided for unconditional payment of $1,000,000 to GECC 180 days after closing. (Tr. 75–76).

Addendum No. 2 was drafted by GECC's lawyers with full knowledge of Armadora's calculation of the Special Interest Payment. (See Tr. 217). Significantly, it reaffirmed that the Special Interest Payment was to be made pursuant to the terms of the Loan Agreement and Addendum No. 1. Addendum No. 2 which was executed by the parties

---

relate to computation of the Special Interest Payment, was expressed to Mr. Gurtler in a meeting between him and Mr. Gonzalez on November 16, 1987. (Tr. 352, 447). The change was acceptable to Mr. Pappas and on November 17, 1987 the Addendum as modified was executed by the parties. (Exh. W, X). This modification indicates that had the parties agreed that the computation of the Special Interest Payment should not track the language of the Loan Agreement, as specified in the drafts of Addendum No. 1 provided by Mr. Pappas on November 12, they could

have modified the language in the Addendum prior to the final signing on November 17.

**6.** This point is made clear in the following testimony by Gonzalez:

Q. Then you tell us that before the addendum was signed, before GECC was obligated to do anything, you were told by Mr. Miliaresis, we want the deductions found in the loan agreement, correct?

A. That is correct. (Tr. 192)

on February 26, 1988 provided in relevant part as follows:

ADDENDUM NO. 2 ("Addendum No. 2") dated February 26, 1988 to Loan Agreement dated as of February 28, 1986, as amended by Addendum No. 1 ("Loan Agreement") . . .

\* \* \* \* \* \*

2. . . . the Borrowers are delivering . . . to GECC . . .

A. Acknowledgement by the Borrowers of their obligation to pay the Special Interest Payment as set forth in the Loan Agreement as amended by Addendum No. 1 (the "Borrowers' Acknowledgment") . . .

\* \* \* \* \* \*

3. GECC and the Borrowers agree that the Borrowers are obligated to make and that GECC is entitled to make a demand for payment by the Borrowers of Special Interest Payment as set forth in the Loan Agreement as amended by Addendum No. 1 not later than 180 days after the date hereof . . .

\* \* \* \* \* \*

8. This Addendum No. 2 and Addendum No. 1 to the Loan Agreement constitute amendments to the Loan Agreement and wherever in the Loan Agreement or in Addendum No. 1 the term "Loan Agreement" is used, it shall be deemed to mean and refer to the Loan Agreement as amended by Addendum No. 1 and by this Addendum No. 2.

\* \* \* \* \* \*

10. Terms used herein and not otherwise defined herein are used as defined in the Loan Agreement. . . .

11. Except as specifically set forth herein, all terms and conditions of the Loan Agreement as amended by Addendum No. 1 shall remain in full force and effect. (Exh. AA).

The Borrowers' Acknowledgment referred to in paragraph 2 of the above quoted Addendum further demonstrates that the Loan Agreement, as amended by the Addenda, is to be the basis of the Special Interest Payment due GECC. The Borrowers' Acknowledgment provides in pertinent part:

Reference is made to the Loan Agreement dated as of February 28, 1986, as amended by Addendum No. 1 and Addendum No. 2 (the "Loan Agreement") . . .

The Borrowers hereby acknowledge that they are jointly and severally obligated to pay to GECC or order (1) the Special Interest Payment as set forth in the Loan Agreement . . . (Exh. BB).

The refinancing transaction closed in February 1988. Pursuant to that refinancing, Armadora refinanced each Vessel for $8,500,000 for a total amount of $17,000,000. (Tr. 91).

On the date of the refinancing and prepayment of GECC's loan by Armadora, the outstanding aggregate principal balance on the GECC loan was $14,951,484.73 ($7,420,699.12 on the Eva Armadora and $7,530,785.61 on the Christina Armadora). (Exh. 11).

On February 26, 1988 Armadora repaid the GECC loan. Thereafter, GECC drew down on the $1,000,000 letter of credit established under Addendum No. 2. (Tr. 75–76). This lawsuit ensued because GECC maintains that it is owed an additional $2,434,554.58 as Special Interest Payment for the reasons stated previously.

GECC proposes two methods for calculating the Special Interest Payment: 1) the method described in the Gonzalez letter or 2) a method derived from the language of section 2.09 of the Loan Agreement. Both methods calculate the Special Interest Payment using only the principal balance due at the time of refinancing rather than including principal and interest paid as well as other expenditures.

METHOD 1

The Gonzalez letter states:

The amount of the 30% "Special Interest Payment" referred to in the Loan Agreement shall be fixed at 30% of the difference between 26.4MM (the average of the attached valuations provided by LQM Associates Corporation and J. Clarkson and Company on the Vessels *"EVA" and "CHRISTINA"*) less the aggregate loan

principal balance on the Vessels on the date of prepayment.

Using the methodology for calculating the Special Interest Payment which was set forth in paragraph (c) of the Gonzalez letter of October 27, 1987 (Exh. 5), the Special Interest Payment due GECC as of the refinancing date is calculated as follows:

A. Deemed Sale Price for Eva Armadora and Christina Armadora    $26,400,000.00

    Less the aggregate principal balance due on the loans at the time of refinancing:     (14,951,484.73)

    (i)    Eva Armadora, S.A.       − 7,420,699.12
    (ii)   Christina Armadora, S.A.       − 7,530,785.61
                        NET       $11,448,515.27

B. The Special Interest Payment, pursuant to the Gonzalez letter of October 27, 1987 was 30% of the Net, i.e., the difference between the Deemed Sale price and the aggregate principal balance due at the time of refinancing:

                                                  11,448,515.27

                                                    ×  .30

SPECIAL INTEREST PAYMENT DUE ON AUGUST 24, 1988     $ 3,434,554.58

---

(Exh. 11; Tr. 74–76)

METHOD 2

Using a methodology derived from section 2.09(a) of the Loan Agreement (Exh. 3), GECC claims that it was entitled to 30% of:

(i) the Excess Income of the Vessels which, by definition, includes the principal amount of any increase over existing indebtedness at the time of any refinancing; *and*

(ii) the excess, on the date of sale, of the gross proceeds from the sale less expenses incurred by the sale and deductions permitted in the definition of Excess Income.

(i) Plaintiff asserts that at the time of the refinancing in February 1988, the outstanding aggregate principal balance on the GECC Loan was approximately $15,000,000. Armadora, however, obtained refinancing in the amount of $17,000,000. Pursuant to § 2.09(a)(i), GECC argues that it was entitled to 30% of the difference between $17,000,000 (the refinanced amount) and $15,000,000 (the existing indebtedness).

| | |
|---|---|
| refinanced amount | 17,000,000 |
| existing indebtedness | 15,000,000 |
| net | 2,000,000 |
| | × .30 |
| (i) | 600,000 |

Therefore, under § 2.09(a)(i) of the Loan Agreement, GECC claims that it was to receive $600,000 ($2,000,000 × .30 = $600,000) for that portion of its Special Interest Payment. (Tr. 91–95)

(ii) GECC also claims that it was entitled to a Special Interest Payment pursuant to § 2.09(a)(ii) of the Loan Agreement. Under that subdivision, GECC claims that it was to receive 30% of the difference between $26,400,000 (the gross proceeds from the sale) less $17,000,000 (the amount of the refinancing).

| | |
|---|---|
| gross proceeds of sale | 26,400,000 |
| refinanced amount | 17,000,000 |
| net | 9,400,000 |
| | × .30 |
| (ii) | 2,820,000 |

Therefore, under § 2.09(a)(ii), GECC asserts that it was to receive $2,820,000 ($26,400,000 − $17,000,000 = $9,400,000; $9,400,000 × .30 = $2,820,000). (Tr. 91–95)

|       | (i)   | 600,000   |
|-------|-------|-----------|
| + (ii)|       | 2,820,000 |

Total Special
Interest Payment     3,420,000

Adding the payments due under both subdivision (i) and (ii) according to GECC's interpretation, the approximate sum that would be due GECC as its Special Interest Payment is $3,420,000.

Plaintiff argues that the methodology set forth by Mr. Gonzalez in his October 27 letter ($3,434,554.58) is the equivalent of a calculation of the Special Interest Payment pursuant to Section 2.09(a)(i) and (ii) of the Loan Agreement ($3,420,000).

That calculation is set forth in Exhibit 12A, which memorializes the calculation done by Mr. Gonzalez on the blackboard at trial in response to a question from the court. (Exh. 12A; Tr. 91–95) Using the approximate figure of $15,000,000 as the outstanding aggregate principal balance, Column 1 represents the calculation done pursuant to the Gonzalez letter of October 27 (Exh. 5) and Column 2 represents the calculation done pursuant to GECC's reading of subdivisions (a)(i) and (ii) of section 2.09 of the Loan Agreement.

| Column 1 |          | Column 2 |          |      |
|----------|----------|----------|----------|------|
| (i)      | 0        | (i)      | 2.0      |      |
|          |          | ×        | .30      |      |
|          |          |          | .6       | .6   |
| (ii)     | 26.4     | (ii)     | 26.4     |      |
|          | 15.0     |          | 17.0     |      |
|          | 11.4     |          | 9.4      |      |
| ×        | .30      | ×        | .30      |      |
|          | 3.42     |          | 2.82     | 2.82 |
|          |          |          | $3.42    | $3.42 |

(All numbers in millions)

## III. CONCLUSIONS OF LAW

### A. *Jurisdiction*

This court has jurisdiction of this action by virtue of the diversity of the citizenship of the parties, the matter in dispute exceeding $50,000, exclusive of interest and costs. 28 U.S.C. § 1332.

7. *See supra* n. 3.

### B. *The Applicable Agreement*

Pursuant to the Loan Agreement, Armadora could not refinance, prepay GECC's Loan, or sell the Vessels without GECC's consent. Sections 4.02(a) and 2.08(c) of the Loan Agreement unambiguously require Armadora to obtain GECC's consent prior to any sale or prepayment.[7] *See Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990) (unambiguous contract must be construed to give effect to intent of parties); *Grumman Allied Industries v. Rohr Industries, Inc.*, 748 F.2d 729, 734 (2d Cir.1984) (court should give effect to contract terms clear on the face of the contract).

■ While the terms of section 4.02(a) and 2.08(c) are clear, this court concluded subsequent to hearing argument on the pretrial motions that section 2.09 of the Loan Agreement is ambiguous. (*See* Transcript of Hearing 11/30/1992 at 65). The court, therefore, looks to all the surrounding documents to determine the intent of the parties regarding § 2.09 of the Loan Agreement. *Curry Road,* 893 F.2d at 511 (court may turn to extrinsic evidence where contract is ambiguous). The parol evidence rule does not preclude the reading of the relevant documents in this case. The parol evidence rule was created to ensure that the subjective intent of a party did not contradict a contract. *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988).

■ Any ambiguity in § 2.09 can be resolved by looking at all the relevant documents. When a document is ambiguous, it is appropriate to look at the surrounding circumstances to discover the parties' true intent. *Garza,* 861 F.2d at 26 (where contract is ambiguous, parties are entitled to "present evidence outside the four corners of the agreement"); *Bird v. Computer Technology, Inc.*, 364 F.Supp. 1336, 1343 (S.D.N.Y.1973) ("When the language of the agreement is patently ambiguous, the Court may look to prior negotiations to determine what was intended"). While extrinsic evidence may be admitted to determine the intent of the par-

ties, it may not serve the purpose of modifying or contradicting the terms of the agreement. *Stratford Group, Ltd. v. Interstate Bakeries*, 590 F.Supp. 859, 864 (S.D.N.Y. 1984) (parol evidence admitted at trial in order to explain, but not to modify or contradict terms of agreement). *See also Bird*, 364 F.Supp. at 1343 (parol evidence rule not violated where oral evidence merely explains but does not alter terms of agreement). In this regard, ambiguity in the agreement must be construed against GECC, as the drafter of the agreement. *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir.1992); *Westchester Resco Co. LP v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir.1987). It was GECC's counsel that created both the structure of the Loan Agreement, the language of section 2.09, and the definition of Excess Income. (Tr. 147).

■ In interpreting the intent of the parties in this case, the court considered the pre-Loan Agreement documents (proposal and commitment letters and Loan Agreement drafts), the final Loan Agreement, the correspondence between the parties (the October 27 letter of Mr. Gonzalez and the November 12 fax coverletter of Mr. Pappas, in particular), the post-Loan Agreement documents (Addenda No. 1 and 2), and testimony at trial regarding all of the relevant documents.

With regard to section 2.09, plaintiff urges that the intent of the parties expressed in the pre-Loan Agreement proposal letter and commitment letter is reflected in Mr. Gonzalez's statement of the terms of the Special Interest Payment in his letter of October 27.[8]

The methodology contained in the Gonzalez letter of October 27, however, is inconsistent with the application of the Special Interest Payment provision in the Loan Agreement.

The October 27 letter and the November 12 fax coverletter did not constitute an offer and acceptance embodying a new agreement that superseded the provisions of section 2.09 in the Loan Agreement.

Moreover, even if the October 27 letter and November 12 fax coverletter constituted a separate agreement or an agreement contemporaneous with Addendum No. 1, that agreement was superseded by Addendum No. 2.

1. Plaintiff's Calculation Pursuant to October 27 Letter is Inconsistent with Loan Agreement

Mr. Gonzalez testified that the methodology found in the proposal and commitment letters and his October 27 letter are the same and that GECC's calculation of its Special Interest Payment is in conformity with the methodology found in those letters. (Tr. 75–76). Mr. Gonzalez, however, testified to certain distinctions between the Loan Agreement and the proposal and commitment letters, on one hand, and Gonzalez's October 27 letter, on the other, indicating that the letter of October 27 and the proposal and commitment letters do not comport with the language of the Loan Agreement which governs here. (Tr. 240–41). This inconsistency detracts from GECC's claim that these letters support its reading of the Loan Agreement.

Additionally, the circumstances leading up to the drafting of the final Loan Agreement establish that Armadora's reading of the Loan Agreement—as permitting the deduction of principal and interest paid to GECC and the other expenses enumerated in the definition of Excess Income (sales expenses, charter broker's commissions, operating expenses, management fees and capital contributions)—is the correct one.

---

8. GECC contends that the original Loan Agreement is ambiguous insofar as how the Special Interest Payment should be calculated, and that the proposal and commitment letters show that it should be interpreted in accordance with paragraph (c) of the October 27 letter. (Tr. 562–63).

Before trial, however, GECC maintained that its claim was founded on the unambiguous language of the Special Interest Payment provision. However, after Mr. Gonzalez indicated that

GECC's calculation pursuant to the Gonzalez letter of October 27 might not be in conformity with the Loan Agreement, GECC's counsel argued at the close of trial that the agreement was ambiguous in order to allow consideration of extrinsic evidence.

It has been Armadora's position throughout this action that the Special Interest Payment provision is unambiguous and extrinsic evidence should not be permitted to change this provision.

Mr. Gonzalez admitted that the profit participation negotiated and agreed to was based on the premise that the vessels would be sold before the end of the loan at substantially more than their current market values and that GECC would share in this appreciation. The reading of the Loan Agreement which GECC argues for would give it a profit participation even where there was a loss due to a decline in the value of the vessels. This was evidenced by Mr. Gonzalez's response to a hypothetical from Armadora's counsel. He was asked to assume that the vessels were sold after they declined in value from $9,000,000 each to $8,000,000, when the outstanding loan balance on each Vessel was $7,500,000. In his reading of the Loan Agreement, GECC would nevertheless be entitled to a "profit participation" on the $1,000,000 *loss* per vessel. (Tr. 222–24).

Moreover, GECC apparently asked for—but was refused—language which would have limited the deduction to outstanding principal. Although Mr. Gonzalez disputes Mr. Miliaresis's testimony that Mr. Miliaresis asked for all of the deductions now claimed by Armadora, a review of the drafting history of the Loan Agreement leads to the conclusion that these deductions were requested and agreed to by GECC.

The original draft of the Loan Agreement did not permit the deduction from the sale proceeds of *any* principal paid to GECC. Mr. Gonzalez at least concedes that at the February 20 negotiation meeting, it was agreed that the outstanding principal owed to GECC should be deducted from the net sales proceeds, and that the redraft which GECC's lawyers were to prepare was to allow for this. It would have been a simple matter to state in the Loan Agreement that only the outstanding GECC principal could be deducted. The redraft, however, said no such thing. Rather, it provided for a detailed list of deductions that Armadora might take, including "any" principal or interest "due or paid." By its terms the deductions were not limited to the outstanding principal due at the time of repayment.

Mr. Gonzalez sought to explain away this language by testifying that the deductions listed were not intended to apply to the period when the GECC loan was outstanding if there were an outright sale without any refinancing; but rather that the deductions only applied if there were a refinancing. (Tr. 239–40). He further maintained that the only principal and interest which would be deductible would be if there were a refinancing and principal and interest were paid on that debt. (Tr. 90–91, 238).

If Mr. Gonzalez's reading were correct, then this redraft had *no* provision whatsoever for the deduction of the outstanding principal balance of the GECC debt. Yet, Mr. Gonzalez, himself, conceded that the insertion of a provision permitting the deduction of the outstanding principal balance on the GECC debt was the very purpose of this revision to section 2.09. (Tr. 230, 235–36).

It would strain credulity beyond the breaking point to conclude, as Mr. Gonzalez would urge, that: (a) GECC's lawyers failed to provide for any deduction for principal paid on the GECC debt, despite their client's admitted instructions to do so; and (b) this fundamental omission was acceptable to Mr. Pappas, Mr. Miliaresis and the Armadora lawyers.

Finally, on cross-examination Mr. Gonzalez conceded that in the case of a sale of the vessels all principal and interest paid from the beginning of the loan to prepayment could be deducted by Armadora. This is made clear in the following exchange:

Q. Assume for a minute that the parties' agreement as set forth in paragraph three of the addendum, that this transaction would be treated as a sale to a third-party, did not involve a refinancing; will you assume that as a hypothetical for a moment? So I can get your understanding of how this clause works.

     \*     \*     \*     \*     \*     \*

Q. Let's assume, then, that the parties agreed that this transaction would be treated as a sale to the third person. We will assume that just for purposes of my question, is that agreed?

A. Okay

Q. Would you explain to the court and to us on that assumption how section 2.09 would apply?

A. Okay. It says on—in section (ii) it says, on the sale date GECC would receive 30 percent of the excess of the total gross proceeds received from the sale. I think that's the $26.4 million.

I don't think we are in disagreement there.

Less, and it goes on, we will skip any other little deductions here and there, but we will go down to what I believe is the key one, which is section four, little—the—of the excess income which was the outstanding income under the loan agreement.

\* \* \* \* \* \*

Q. So then in order to follow the requirements of section 2.09 in the case of a sale, you would then turn to clauses (i) through (iv) of the definition of excess income, is that correct?

A. That's correct.

\* \* \* \* \* \*

Q. In the case of a sale, you agree that principal and interest paid for the relevant period in respect of any outstanding indebtedness respecting such vessel can be deducted, is that correct?

A. That is correct.

Q. This language reads that principal and interest paid for the relevant period in respect of any outstanding indebtedness respecting the vessel can be deducted, is that right?

A. That's correct.

Q. Is it not true that from the period of the making of the loan up until the time of this sale, there was outstanding indebtedness to GECC?

A. That's correct.

Q. Is it not true that principal and interest were paid during this period?

A. I maintain—

Q. I am sorry, is it not true that principal and interest were paid to GECC in this period in respect of the outstanding indebtedness—

A. The answer to your question is yes. (Tr. 106–09).

In sum, while plaintiff would only permit defendants to deduct some of the principal

and interest and nothing else, the Loan Agreement permits defendants to deduct any amounts due or paid as provided in the definition of Excess Income. This includes any principal and interest due or paid.

The testimony of GECC's sole witness, the drafting history of the Loan Agreement, and the irreconcilable terms of the Loan Agreement and Mr. Gonzalez's October 27 letter indicate that plaintiff's calculations are inconsistent with the Loan Agreement.

2. The Gonzalez Letter And the Pappas Fax Coverletter Are Not Part of A New Agreement

■ Plaintiff claims, in the alternative, that Mr. Gonzalez's October 27 letter and Mr. Pappas's November 12 coverletter constitute an offer and acceptance, a separate agreement that superseded the Loan Agreement. Additionally, plaintiff contends that the Gonzalez letter and the Pappas coverletter were executed contemporaneously with Addendum No. 1, such that the three documents constitute one agreement that superseded the Loan Agreement. Neither of these arguments is persuasive.

The language of the correspondence does not support plaintiff's contention that the correspondence constituted an agreement. The letter from Mr. Gonzalez states that "[t]he purpose of this letter is to state my understanding of the current state of negotiations." This language does not suggest an offer. This language does not even suggest that negotiations are concluded. The explicit stated purpose of the letter contradicts plaintiff's assertion.

The conclusion of the letter states, "if [Mr. Pappas] is in general agreement, I would like to suggest that his counsel prepare a written agreement for GECC's review and execution." This language implies that the letter does not state the terms of an agreement. If the letter did state the terms of an offer or agreement then Mr. Gonzalez would not suggest that Mr. Pappas's "counsel prepare a written agreement for GECC's review." The October 27 letter is clearly what the letter itself states it is—a statement of Mr. Gonzalez's understanding of the state of the negotiations; it is not an offer.

The fax coverletter from Mr. Pappas is not an acceptance. The first paragraph of the fax states that the Addendum (not the fax) was prepared by attorneys, implying that the Addendum and not the fax coverletter is the agreement. The second paragraph states that the "ADDENDUM FORMALIZES THE AGREEMENT WHICH WE HAVE REACHED." In other words, any prior understandings were informal and non-binding. The Addendum as the formal agreement and not the coverletter to the Addendum is binding. Plaintiff misstates Mr. Pappas's coverletter. Plaintiff argues that the coverletter "unequivocally states that the attached Addendum No. 1 executed by Armadora 'recapitulates' the terms of the Gonzalez letter." (Memorandum of Law of General Electric Capital Corporation In Support of Its Motion In Limine to Exclude Certain Evidence at Trial and in Opposition to Defendants' Motion In Limine To Exclude Certain Evidence at Trial ("Pl.Mem. I") at 18). The coverletter, however, states "THIS ADDENDUM FORMALIZES THE AGREEMENT WHICH WE HAVE REACHED AS RECAPITULATED IN YOUR LETTER ... DATED OCTOBER 27, 1987." In other word, the coverletter states that the recapitulation occurred in Mr. Gonzalez's letter not in the Addendum. The description of Mr. Gonzalez's letter as a recapitulation also suggest its non-binding nature.

The third paragraph of the coverletter states that Mr. Pappas sent three signed originals of the Addendum, implying that he considered the Addendum and not the coverletter to be the relevant document. In other words, Mr. Pappas did not, for example, send three copies of the fax coverletter to be duly executed by an authorized GECC officer. The coverletter is clearly not an "acceptance." There was no meeting of the minds to form a new agreement, as Mr. Gonzalez's own testimony makes apparent. Mr. Gonzalez knew that his October 27 letter varied the Loan Agreement. Both Mr. Gurtler and Mr. Miliaresis told Mr. Gonzalez that the terms stated in his October 27 letter were unacceptable and that the Loan Agreement had to govern.

The correspondence between Mr. Gonzalez, Mr. Gurtler, and Mr. Pappas do not constitute an agreement.

3.  If the Gonzalez Letter And the Pappas Fax Coverletter Constituted A New Agreement, It was Superseded by the Addenda

██ Even if the letters constituted a separate agreement, to the extent that that agreement would affect the calculation of the Special Interest Payment, it would be superseded by Addendum No. 1 and Addendum No. 2. Both addenda were signed after the correspondence were exchanged. Neither mentions either the October 27 letter or the November 12 fax coverletter. Both addenda refer to the original Loan Agreement for determination of all terms not specified in the addenda. Therefore, any agreement reached by correspondence would have been superseded by the addenda.

Moreover, Addendum No. 1 could not be part of a conjunctive agreement with the Gonzalez letter and the Pappas fax coverletter because Addendum No. 1 specifically provides that section 2.09 of the Loan Agreement governs and makes no mention of either the Gonzalez letter or the Pappas fax. Additionally, Addendum No. 1 was executed by the parties on November 17, after the initial version of the addendum had been modified and five days after the Pappas fax coverletter had been sent.

██ An agreement is integrated when the parties thereto adopt the writing as the final and complete expression of their agreement. 9 WIGMORE, *Evidence* § 2425 (Chadbourne Rev.1981) ("notion of integration is ... that the terms are contained in a different material or embodiment; and therefore the act is complete and binding when finally assented to before integration, even if it is an agreed condition that the act shall be so reduced or integrated"). Under New York law, a written document which appears complete on its face is integrated as a matter of law. *Battery Steamship Corp. v. Refineria Panama S.A.*, 513 F.2d 735, 738 n. 3 (2d Cir.1975). While extrinsic evidence cannot be admitted to prove terms of integrated contract it may be admitted to aid in

interpreting ambiguous terms. *Proteus Books Limited v. Cherry Lane Music Co.*, 873 F.2d 502, 509 (2d Cir.1989).

■ The evidence surrounding the negotiation and execution of the addenda supports the conclusion that Addendum No. 1 and Addendum No. 2 were the final and integrated agreements of the parties and they cannot be varied by parol evidence in the form of the October 27 letter and November 12 fax.

Addendum No. 2 reaffirms the provision in Addendum No. 1 stating that section 2.09 is to govern the agreement, as well as stating that section 2.09 remains in full force and effect unless specifically modified in either Addendum. No such modification appears in either Addendum, and Mr. Gonzalez does not deny that he never asked Mr. Pappas to provide in either Addendum that the October 27 letter or November 12 fax coverletter were to govern the Special Interest Payment. (Tr. 217, 403). Accordingly, there is no basis for GECC to now claim that these formally executed Addenda do not reflect the parties true agreement.

## C. *Specific Deductions Permitted*

Plaintiff is entitled to a Special Interest Payment as provided in section 2.09(a)(ii) of the Loan Agreement which incorporates the deductions listed in clauses (i) through (iv) of the definition of Excess Income: commissions paid to independent charter brokers, operating expenses directly related to such Vessel[s] including drydocking expenses paid by the relevant Borrower under the Bareboat Charter, management fees due to a manager under a management contract approved by GECC, principal and interest paid for the relevant period in respect of any outstanding indebtedness respecting such Vessel. Armadora is also entitled to deduct their capital contributions pursuant to section 2.09(e) of the Loan Agreement.

The largest single deduction and the biggest difference between the parties' calculations concerns the deduction for principal and interest. Under Excess Income item (iv), Armadora is entitled to deduct the principal and interest paid to GECC during the loan period. There is no dispute as to the amount of principal and interest paid by Armadora to GECC. The principal paid to GECC is the amount of the loan, $18,000,000. (Tr. 537–38; Exh. VV). The interest paid to GECC from the beginning of the loan to repayment on both Vessels is $3,119,178. (Exh. QQQQ). The total principal and interest deduction to be taken by Armadora from the deemed sales proceeds is, therefore, $21,119,178. (Exh. QQQQ).

Armadora has deducted $403,509 for expenses incurred in connection with the 1988 refinancing. (Exh. QQQQ). These expenses which were actually paid by Armadora included legal, banking and finance brokerage fees. (Exh. EE; Tr. 526–28). The Loan Agreement permits a deduction for expenses incurred in connection with a sale, section 2.09(ii)(A). Under the addenda, the parties agreed to treat the refinancing as a sale. Accordingly, this deduction was properly taken.

Pursuant to Excess Income item (i), Armadora has the right to deduct charter broker's commissions. The broker who procured the three year bareboat charter parties with Shell Oil for each Vessel was LQM Associates, Inc., an independent charter and sale broker located in New York. (Tr. 410–11; Exhs. J1, J2). Armadora as Vessel owner was responsible to pay to LQM a 1.75% commission on the monthly charter hire received from Shell on each of the Vessels. (Tr. 529–30). As requested under the commission agreement between LQM and Armadora, Armadora authorized Shell to pay the commissions directly to LQM from the monthly charter hire owed to Armadora (Exhs. JJJJ, KKKK; Tr. 463–64, 530). Thus, LQM received a monthly commission of $2,022.72 on the CHRISTINA charter and $2,247.75 on the EVA charter. (Exhs. GG, AAA). Armadora is therefore entitled to deduct the commissions paid to LQM during the two year period of the loan in the amount of $100,067. (Exh. QQQQ).

The operating expenses deducted by Armadora pursuant to Excess Income item (ii), consist of the costs of various insurance policies for the Vessels, repairs to the ships and vessel registration fees incurred during the period of the GECC loan. (Exhs. II, CCC;

Tr. 531–34). The total amount of these expenses which are claimed and permitted to be taken by Armadora as a deduction is $111,339. (Exh. QQQQ).

The management contracts entered into between Atlantic Maritime Enterprises and Eva Armadora S.A. (Exh. CC) and Christina Armadora S.A. (Exh. DD) were never submitted to GECC for its approval. Therefore, even though Armadora might have been able to deduct management fees had they submitted the contracts for approval, these specific fees cannot be deducted because Armadora did not comply with the Loan Agreement and obtain the approval of GECC (Exh. 3 at 3; Tr. 515, 557).

Likewise, no management contract with Astron Management was ever submitted to GECC for its approval. (Tr. 515, 546–47). These specific fees, therefore, cannot be deducted because Armadora did not comply with the Loan Agreement and obtain the approval of GECC for fees paid to Astron Management. (Exh. 3 at 3).

Under paragraph (e) of section 2.09 Armadora is permitted to deduct its capital contributions.[9] Armadora has incurred $246,364 in expenses representing various legal, banking and finance brokerage fees paid by it in connection with the GECC loan. (Exhs. NN, HHH; Tr. 538–41). Since the entire earnings of the Vessels net of commissions were being paid to GECC in reduction of the loan these were expenses which Armadora or its shareholders were required to pay out-of-pocket. (Tr. 539–40). As a result capital was advanced by other companies within the Pappas group to pay these expenses which Armadora had to subsequently reimburse. (Tr. 415–16, 540). These expenses therefore may properly be deducted by Armadora as part of the cost of contribution to capital.

## IV. CONCLUSION

The calculation of the Special Interest Payment is governed by the Loan Agreement and Addendum No. 1 and Addendum No. 2. Armadora is entitled to the deductions pro-

vided for in section 2.09 and the definition of Excess Income to the extent that it complied with the requirements of the Loan Agreement. Armadora is also entitled to deduct its capital contributions as provided for in the Loan Agreement.

Submit order on 15 days notice.

---

9. Section 2.09(c) states:
    Notwithstanding anything contained herein to the contrary, any contribution to capital

respecting the relevant Borrower made on or after the date hereof shall be repaid in full prior to any Special Interest Payment.